2006-NMCA-080

139 P.3d 864

Arlo and Joyce MURKEN, on behalf of themselves and all others similarly situated, Plaintiffs,

v.

DEUTSCHE MORGAN GRENFELL, INC., John S. Rendall, and W. Jack Butler, Defendants,

and

John S. Rendall, Third–Party Plaintiff–Appellant,

v.

Suncor Energy, Inc.; Syncrude (Canada), Inc.; Shell (Canada), Inc.; Exxon–Mobil, Inc.; Deutsche Bank, AG; Raymond and Rawl (Exxon); R. George (Suncor); Bob Pitman; Al Hyndman (Syncrude); Helmar Kopper (Deutsche Bank); and Merrill Lynch, Inc., Third–Party Defendants–Appellees.

No. 24,277.

Court of Appeals of New Mexico.

June 5, 2006.

John S. Rendall, Albuquerque, NM, Pro Se Appellant.

David L. Norvell, Albuquerque, NM, for Appellant.

Robert A. Johnson, Johnson & Nelson, P.C., Albuquerque, NM, Joel R. Sharp, Jenkens & Gilchrist, Dallas, TX, for Appellee Merrill Lynch.

## OPINION

KENNEDY, Judge.

{1} Defendant and third-party plaintiff John S. Rendall appeals the district court's order compelling him to arbitrate his claims against Merrill Lynch. Rendall asserted claims against Merrill Lynch after he was named as a defendant in a securities fraud class action brought by former shareholders of Solv–Ex Corporation (Solv–Ex). Rendall had been a corporate officer of Solv–Ex when the company's stock abruptly plummeted. He claimed that Merrill Lynch, among others, had been responsible for the demise of Solv–Ex. The district court, pursuant to a provision in a pledge agreement (the Agreement) between Rendall and Merrill Lynch, compelled Rendall's claims to arbitration.

{2} Merrill Lynch asserts that none of Rendall's claims were preserved for our review. We hold that Rendall's argument that the existence of an arbitration agreement is a question for the jury was clearly not preserved. Rendall's argument that his claims for conspiracy, RICO, and antitrust involve third parties, and are hence not subject to arbitration, was also not sufficiently preserved for our review. We have doubts that Rendall's remaining arguments were preserved, but will give Rendall the benefit of the doubt and address these arguments on the merits.

{3} We hold that Rendall's objection to the Agreement documents could be characterized as an authenticity objection in its most basic terms. However, we hold that Rendall later conceded that the challenged document was authentic because, in the course of challenging the Agreement's accuracy, Rendall made statements that conceded its authenticity. Next, we address the two parts of Rendall's fraud in the inducement claim concerning the Agreement. Rendall admitted signing the second page of the Agreement (which acknowledged the first page and stated that his disputes with Merrill Lynch would be arbitrated). We hold that under these circumstances, the district court properly compelled arbitration. We affirm.

## I. BACKGROUND

{4} This case is one of many appeals arising from litigation surrounding the collapse of Solv–Ex stock. In October 1996, after the value of Solv–Ex stock plummeted, Solv–Ex shareholders sued Rendall and others, primarily claiming that these Defendants had in various ways deliberately distorted Solv–Ex's financial condition.

{5} Approximately six years later, in 2002, Rendall filed his answer along with counterclaims, cross claims, and a third-party complaint. Rendall named in his third-party complaint approximately a dozen new parties that he blamed for Solv–Ex's downfall, including Merrill Lynch. He claimed that Merrill Lynch had pulled the "final trigger" in Solv–Ex's demise.

{6} Rendall admitted in his complaint that he had executed a pledge agreement with Merrill Lynch in March 1997 securing a loan of $4 million with approximately 2.61 million restricted shares of Solv–Ex common stock. Shortly after making the loan, Merrill Lynch demanded repayment. When Rendall did not pay, Merrill Lynch started selling the Solv–Ex stock. Rendall claimed that this

action caused a sharp decline in the value of Solv–Ex stock, causing Solv–Ex to lose financing, which in turn caused it to shut down operations and later file bankruptcy. He also claimed that Merrill Lynch had "made false and misleading statements to the public in order to make the sale." Merrill Lynch also allegedly forced Rendall to sign a release of his claims against it in return for the Solv–Ex stock still in its possession.

{7} Based on these factual allegations, Rendall asserted claims against Merrill Lynch for breach of a fiduciary duty under the pledge agreement, breach of contract, and breach of the covenant of good faith and fair dealing. Rendall claimed that Merrill Lynch had fraudulently "sold [his] ... stock under false pretenses, which destroyed the Solv–Ex financing and injured ... Rendall." Rendall claimed that Merrill Lynch had interfered with his prospective economic advantages when it refused to release the stock remaining in its possession until Rendall relinquished his claims against it. Rendall also claimed intentional or negligent infliction of emotional distress as a result of Merrill Lynch's actions. Finally, Rendall made other claims that did not specify a party against whom he was making the claim.

{8} Merrill Lynch moved to compel arbitration or to alternatively dismiss Rendall's claims against it.[1] Attached to its unverified motion was what it claimed to be "a true and correct copy of the March 20, 1997 Pledge Agreement ... signed by Mr. Rendall." This copy was almost illegible. Merrill Lynch also attached a clear and easily legible form pledge agreement that was unsigned and did not have any information typed into its blanks. There was no overt explanation in the motion of how this form agreement was related to the Agreement itself. Merrill Lynch asserted that in the pledge agreement, Rendall had agreed to arbitrate all of his claims against Merrill Lynch. Rendall filed a written response to Merrill Lynch's motion.

{9} On June 12, 2003, the district court heard the parties' arguments on this motion.

Rendall objected to the admission of the documents that had been attached to Merrill Lynch's motion to compel arbitration. He denied the existence of any arbitration agreement, asserting that he had only signed and faxed back to Merrill Lynch one illegible sheet of paper. He said that the only agreement contained on the sheet of paper he had signed was the agreement to pledge the Solv–Ex shares for a loan of $3.8 to $4 million. After Rendall spoke, the district court orally granted Merrill Lynch's motion to compel arbitration. The district court entered its written order on July 7, 2003, ordering arbitration "in accordance with the agreement attached to the motion." Rendall now appeals the order compelling his claims against Merrill Lynch to arbitration.

## II. DISCUSSION

### A. Preservation of Issues

■ {10} Merrill Lynch argues that Rendall did not preserve any of his arguments for our review.

> [I]n order to preserve an issue for appeal, a [party] must make a timely objection that specifically apprises the trial court of the nature of the claimed error and invokes an intelligent ruling thereon.... [I]t is essential that the ground or grounds of the objection or motion be made with sufficient specificity to alert the mind of the trial court to the claimed error or errors, and that a ruling thereon then be invoked.

*State v. Elliott,* 2001–NMCA–108, ¶ 21, 131 N.M. 390, 37 P.3d 107 (internal quotation marks and citations omitted).

■ {11} We first address the preservation of Rendall's argument that the existence of an arbitration agreement is an issue of fact for the jury. We have not discovered any point where Rendall invoked a ruling from the district court on this issue. *See id.* Rendall has not directed our attention to where this issue was preserved. *See* Rule 12–213(A)(4) NMRA (requiring a statement of how and where an issue was preserved below). Points in Rendall's pleadings and ar-

---

1. Because the district court did not reach Merrill Lynch's motion to dismiss Rendall's claims on the merits, our review is limited to questions surrounding Rendall's claims to arbitration. We therefore do not reach any question of the sufficiency of Rendall's claims.

gument also state, to the contrary, that the district court must decide this issue. We therefore hold that Rendall did not preserve this argument for our review.

■ {12} Also, Rendall argues that the district court's sending of his conspiracy, RICO, and antitrust claims to arbitration was improper because these claims involve third parties. Merrill Lynch asserts that none of these claims were actually pleaded against itself and that this issue was not preserved. We agree.

{13} Rendall argues that he invoked a ruling from the district court on his legal argument via a statement in his complaint that he "restates and incorporates the preceding fact allegations." This argument confuses the making of a factual assertion with invoking a ruling from the district court on a specific legal argument. *See Elliott*, 2001–NMCA–108, ¶ 21, 131 N.M. 390, 37 P.3d 107. It does, however, appear that in his reply brief to Merrill Lynch's motion to compel arbitration, he argued that these claims were not subject to arbitration. Rendall then abandoned this argument at the hearing, merely alleging that Merrill Lynch had engaged in a conspiracy and committed RICO and antitrust violations without asserting that these claims had any specific legal consequence to the question of arbitration.

{14} These claims had not been previously asserted against Merrill Lynch. Rendall's complaint listed numerous parties and claims. Rendall failed to specifically assert in his complaint Merrill Lynch's involvement in an alleged conspiracy. Rather, he specifically referred to a conspiracy among Syncrude, Suncor, and possibly Shell and Exxon. His claim for conspiracy under RICO named two categories of people: the "Competitors" and the "Short Sellers." Merrill Lynch was not categorized as either in Rendall's complaint. As for conspiracy under antitrust laws, Rendall only named "the Competitors": Syncrude, Suncor, Shell, and Exxon, whom he generally claimed throughout his complaint were involved in a conspiracy. Rendall did not state in his complaint any action or relationship between Merrill Lynch and the other named parties. To the contrary, his claims only focused on Merrill Lynch's

actions in relationship to the Agreement. Owing to the vagueness and broadness of the complaint, we cannot say that Rendall also meant to include Merrill Lynch within his conspiracy, RICO, or antitrust claims. *See Apodaca v. AAA Gas Co.*, 2003–NMCA–085, ¶ 74, 134 N.M. 77, 73 P.3d 215 ("Upon a doubtful or deficient record, every presumption is indulged in favor of the correctness and regularity of the trial court's decision, and the appellate court will indulge in reasonable presumptions in support of the order entered." (internal quotation marks and citation omitted)). The main problem with the argument Rendall asserts on appeal is his lack of specificity below. *See Elliott*, 2001–NMCA–108, ¶ 21, 131 N.M. 390, 37 P.3d 107 (noting that specificity is essential in invoking a ruling from the district court). We therefore hold that because Rendall raised his conspiracy, RICO, and antitrust claims against Merrill Lynch for the first time at the hearing on the motion to compel arbitration, but did not at that time argue that those claims involving third parties were not subject to arbitration, he did not "specifically apprise[ ] the trial court of the nature of the claimed error and invoke[ ] an intelligent ruling thereon." *Id.*

## B. Authentication of the Agreement

■ {15} Rendall argues that the Agreement pursuant to which the district court compelled arbitration was not properly authenticated. Merrill Lynch argues that Rendall admitted to the existence of the Agreement. Merrill Lynch does not claim that the document it submitted was self-authenticating pursuant to Rule 11–902 NMRA, and thus narrows our focus in this opinion to Rule 11–901 NMRA. As an evidentiary issue, the admission or exclusion of the document attached to Merrill Lynch's motion to compel arbitration is within the discretion of the district court. *See State v. Apodaca*, 118 N.M. 762, 771, 887 P.2d 756, 765 (1994); *Couch v. Astec Indus., Inc.*, 2002–NMCA–084, ¶ 8, 132 N.M. 631, 53 P.3d 398.

{16} Before addressing the merits of these claims, we address Merrill Lynch's contention that Rendall failed to preserve his authenticity argument. At the hearing on Mer-

rill Lynch's motion to compel arbitration, Rendall stated:

> As a threshold premise, ... I object to these documents [referring to the document attached to Merrill Lynch's motion to compel arbitration] coming into Court. I object to what is purported to be an agreement that I signed. I object. I have never stipulated to it and I object to those documents entering in without the due process of law to check [the] veracity of those documents.

{17} This statement could be interpreted as an authentication objection in its most basic terms, i.e., that the thing must be shown to be what its proponent claims it is. *See* Rule 11–901(A) (stating that authentication "as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims"). Yet in light of Rendall's later statements that focused on the Agreement's *accuracy,* while conceding its authenticity, Rendall's reference to "veracity" could also be contextually interpreted as a claim that the Agreement did not truly reflect an agreement to arbitrate. *See Apodaca,* 2003–NMCA–085, ¶ 59, 134 N.M. 77, 73 P.3d 215 (distinguishing between arguments challenging the authenticity of a document and arguments challenging the document's accuracy). We therefore harbor some doubts that an authenticity objection was actually made. *See Reeves v. Wimberly,* 107 N.M. 231, 236, 755 P.2d 75, 80 (Ct.App.1988) (stating that where the record is doubtful or deficient, "every presumption is indulged in favor of the correctness and regularity of the trial court's decision, and the appellate court will indulge in reasonable presumptions in support of the order entered"). However, even if Rendall preserved his authenticity argument, this is not an argument on which he could prevail.

■ {18} "The requirement of authentication ... as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Rule 11–901(A). Merrill Lynch produced no witnesses to testify that the Agreement attached to its motion was the one that Rendall

had signed or that the signature on the Agreement was Rendall's. We have previously acknowledged that, in some areas, foundation requirements have become more relaxed. *See State v. Ramirez,* 89 N.M. 635, 646, 556 P.2d 43, 54 (Ct.App.1976), *overruled on other grounds by Sells v. State,* 98 N.M. 786, 653 P.2d 162 (1982). While acknowledging this trend, we have reiterated that "[f]oundation requirements have not been eliminated altogether." *Ramirez,* 89 N.M. at 646, 556 P.2d at 54. "Unless they fall within the narrow exception for self-authenticating documents, the records must be authenticated." *Id.*

■ {19} At the hearing on Merrill Lynch's motion to compel, Merrill Lynch asserted that "[t]here's no dispute that that is the [A]greement that covered" its relationship with Rendall. Soon thereafter, Rendall made an objection that could be construed as an authenticity objection. However, Rendall later conceded that the document was authentic, i.e., that the document Merrill Lynch had attached to its motion was *the* Agreement that he had signed. Some time after making his authenticity objection, he stated,

> I said okay, send me one, what to sign. They sent me one sheet of paper. A signature paper which nobody can read. At the top was 2.61 million in shares and at the bottom was a signature. I signed it. Nobody can read that sheet of paper. I signed it, faxed it back and sent the original back. One sheet of paper.

Rendall thus conceded to our satisfaction that the document was authentic, i.e., that the copy of the faxed document Merrill Lynch had attached to its motion was *the* Agreement that he had signed.

■ {20} Furthermore, typed into the blanks on the second page of this document was "2.610 M," "Solv–Ex," and "3.8 Million." This is the exact number of shares and the correct party that Rendall, in his complaint, agreed were part of his Agreement with Merrill Lynch. Rendall also stated at the hearing that he signed an agreement with the exact characteristics of the document attached to Merrill Lynch's motion: 2.61 million shares at the top, a signature at the

bottom, and difficult to decipher. Finally, in Rendall's complaint, he stated that he entered into the Agreement. We hold that these statements, in light of the document itself, provided the district court with sufficient evidence to find that the document Merrill Lynch attached to its motion to compel was what Merrill Lynch claimed it was. *See* Rule 11–901(A).

{21} Rendall apparently abandoned his authenticity arguments, to the extent he made them, in pursuing his arguments as to the accuracy of the document. In *Apodaca*, 2003–NMCA–085, 134 N.M. 77, 73 P.3d 215, we distinguished between a challenge to the documents' authenticity and a challenge to the accuracy of statements within those documents. *Id.* ¶ 59. The latter challenge does not go to admissibility, but to weight. *Id.* Here, Rendall ended up conceding authenticity and only challenging accuracy. Our standard of review is abuse of discretion. *Couch*, 2002–NMCA–084, ¶ 8, 132 N.M. 631, 53 P.3d 398. We see no abuse because the factual information that Rendall conceded correlated precisely to the information in the Agreement. We therefore hold that it is not an abuse of discretion to admit the Agreement that Rendall admitted signing. We affirm the district court on its use of this document to find an arbitration agreement.

## C. Fraud in the Execution and Inducement

{22} Rendall argues that the district court should have decided his fraud in the inducement claims before deciding whether a valid agreement to arbitrate existed. There appear to be two questions here: the first is addressed to the entire Agreement, the second to the arbitration agreement contained within it.

{23} We first address whether Rendall preserved his argument. It is questionable whether Rendall preserved either aspect of this fraud claim. His complaint presumes the validity of the Agreement, which he claims that Merrill Lynch breached. In the complaint, Rendall does not plead facts concerning the formation of the Agreement, but focuses on Merrill Lynch's actions once it obtained his Solv–Ex stock. From his plead-

ings, there is no question that Rendall knew that he was securing a loan from Merrill Lynch based on his pledge of Solv–Ex stock; his claims, and particularly the facts he alleges to support them, relate to what he feels Merrill Lynch did with the stock once the stock was in its possession.

{24} In Rendall's motion in opposition to arbitration, he stated that Merrill Lynch induced him to enter into the Agreement. However, the facts alleged by Rendall all deal with Merrill Lynch's actions after the Agreement was executed. For example, at the hearing on Merrill Lynch's motion to compel arbitration, Rendall reiterated the allegation in his complaint that Merrill Lynch had wrongfully sold the shares it had obtained from him after signing the Agreement. Rendall also asserted that Merrill Lynch had acted as "part of a conspiracy" with superior bargaining power: "There's fraud adequately pled, it's in the complaint." Both assertions concern acts of Merrill Lynch occurring after the Agreement was executed.

{25} In responding to the motion to arbitrate, Rendall quoted law stating that fraudulently procured *arbitration agreements* cannot be used to compel arbitration. After the district court ruled, Rendall "read the cases in" that supported the argument from his motion that the court must determine issues of fraud in the inducement. Rendall's factual assertions related to matters occurring after the Agreement was executed, his invocation of "fraud" was general, and his legal authority only related to fraudulently procured arbitration agreements. This was not specific enough to invoke a ruling from the district court on fraud as to the entire Agreement. *See Elliott*, 2001–NMCA–108, ¶ 21, 131 N.M. 390, 37 P.3d 107. We therefore hold that Rendall's claim goes to the arbitration agreement, not the Agreement as a whole, and address the enforcement of the arbitration agreement under a de novo standard of review. *See Alexander v. Calton & Assocs., Inc.*, 2005–NMCA–034, ¶ 8, 137 N.M. 293, 110 P.3d 509 (stating that we review the district court's grant of a motion to compel arbitration de novo); *see also DeArmond v. Halliburton Energy Servs.,*

*Inc.,* 2003–NMCA–148, ¶ 4, 134 N.M. 630, 81 P.3d 573.

{26} Rendall makes two factual assertions to support his argument that the district court was required to adjudicate his fraud claims before compelling arbitration. Because each of these factual assertions are of a different character, we address them separately. Rendall's first claim is that he only saw and signed the second page of the Agreement, and that Merrill Lynch "hid" the arbitration provision on the first page. This assertion has little to do with fraud in the inducement, but is more akin to fraud in the execution. *See McLean v. Paddock,* 78 N.M. 234, 238, 430 P.2d 392, 396 (1967) (distinguishing between fraud in the inducement and fraud in the execution; the latter involves a document "signed under a mistaken belief as to its contents, due to fraud," or where executed in the belief that the document represents something else, such as fraudulently switching one document for another or where another trick or artifice is used to secure a signature), *overruled on other grounds by Duke City Lumber Co. v. Terrel,* 88 N.M. 299, 540 P.2d 229 (1975); *Rodriguez v. Horton,* 95 N.M. 356, 361, 622 P.2d 261, 266 (Ct.App.1980) (stating that fraud in the execution includes a party signing a contract under a mistaken belief as to its contents).

{27} Merrill Lynch invites our attention to the second page of the Agreement that Rendall admitted signing. This second page stated there was a first page and contained an acknowledgment of receipt of the Agreement. The second page also stated that the signor agreed to arbitrate any disputes that arose with Merrill Lynch. Rendall does not dispute that this language was on the second page. We therefore regard Rendall's assertion that the arbitration provision was fraudulently concealed on the *first page* of the Agreement as immaterial to an interpretation of the second page. Parties to a written contract are generally presumed to know the contents of the contract and to have agreed to them, absent fraud, misrepresentation or some other wrongful conduct, which will be addressed in this opinion. *See Smith v. Price's Creameries,* 98 N.M. 541, 545, 650 P.2d 825, 829 (1982). The district court would not have erred in applying this presumption to the contents of the second page alone and ordering arbitration. *See K.L. House Constr. Co. v. City of Albuquerque,* 91 N.M. 492, 494, 576 P.2d 752, 754 (1978) (stating that it is the district court's role to determine the existence of an arbitration provision and that once it has done so, it should order arbitration); *see also Meiboom v. Watson,* 2000–NMSC–004, ¶ 20, 128 N.M. 536, 994 P.2d 1154 (stating that we affirm the district court when it rules correctly, even if the ruling is for the wrong reason). With millions of dollars at stake in the Agreement, the gravity of the Agreement and the accessibility of its terms lead us to presume that Rendall was sufficiently aware of what he signed as to impute his agreement to arbitrate his disputes with Merrill Lynch on the second page of the Agreement. Thus, whether Rendall's claim with respect to a hidden arbitration provision is characterized as fraud in the inducement or fraud in the execution, we hold that Rendall had adequate notice and knowledge of the arbitration provision at the time he signed the Agreement. He therefore has no factual basis supporting such a claim.

{28} We now turn to Rendall's second factual assertion, that Merrill Lynch secured the arbitration agreement by fraudulently misrepresenting its intent. Rendall relies upon *Shaw v. Kuhnel & Assocs., Inc.,* 102 N.M. 607, 608, 698 P.2d 880, 881 (1985), *superseded by statute as stated in Aguilera v. Palm Harbor Homes, Inc.,* 2002–NMSC–029, ¶ 6, 132 N.M. 715, 54 P.3d 993, for his argument that the district court must decide his fraud in the inducement claim before compelling arbitration. *Shaw* construed a motion to compel arbitration as a "suit for specific performance of an agreement to arbitrate." *Id.* At issue in that case was whether the defendants could compel arbitration of its contracts with the plaintiffs where performance of those contracts was prohibited. *Id.* The performance of the contracts was barred because one defendant was not licensed in New Mexico to perform the work it had contracted to do. *Id. Shaw* noted that performance of the other defendant's contract could also be barred because that defendant

was a corporation that was not licensed to do business in New Mexico. *Id. Shaw* thus held since the performance of one, and possibly both, contracts was enjoined, compelling arbitration under such illegal contract(s) was also enjoined. *Id.*

{29} The Supreme Court then proceeded to an issue it stated was "unnecessary to a determination of [the] case." *Id.* The ensuing discussion stated that the district court should determine fraud in the inducement of an entire agreement, since to compel arbitration of a contract that might itself be declared invalid for fraud in its inducement—including its arbitration agreement—would be "ridiculous." *Id.* at 608–09, 698 P.2d at 881–82. When an appellate court makes statements that are unnecessary to its decision, those statements are without the binding force of law. *See Ruggles v. Ruggles,* 116 N.M. 52, 59 n. 8, 860 P.2d 182, 189 n. 8 (1993); *Kent Nowlin Constr. Co. v. Gutierrez,* 99 N.M. 389, 390–91, 658 P.2d 1116, 1117–18 (1982). As a result, we recognize a problem.

{30} *Shaw* points out that NMSA 1978, § 44-7-1 (1971) of the Uniform Arbitration Act stated that an agreement to arbitrate is "valid, enforceable and irrevocable, save upon such grounds as exist at law or in equity for the revocation of any contract." *Shaw,* 102 N.M. at 608, 698 P.2d at 881 (internal quotation marks and citation omitted). The Supreme Court continued, saying "an arbitration clause is enforceable and valid" absent the existence of "legal or equitable grounds for revoking *it." Id.* (emphasis added). This pronoun, together with *Shaw's* statements that New Mexico's judicial policy favors arbitration of claims and that an agreement to arbitrate is itself an agreement capable of specific performance, *see id.,* creates an ambiguity and begs a question: "ridiculous" or not, can an arbitration clause be invoked even if the entire contract that contains it might be declared invalid? If New Mexico's judicial policy promotes determining a contract's validity in other respects by resort to arbitration as a substitute for litigation, there may be nothing ridiculous about allowing a district court to compel arbitration under an arbitration clause where an arbitrator might then ultimately decide that the contract that contains the clause is otherwise void.

{31} *Shaw's* application to fraud in the inducement of the entire contract is not, however, the case we have before us. However, Rendall relied on *Shaw,* his claim is fraud relating to the arbitration agreement, and *Shaw* can be read as indicating that the district court should decide that issue before sending the entire contract to the arbitrator. Therefore, when a party challenges only an arbitration provision as fraudulently induced, the district court must decide this issue before sending the entire contract to the arbitrator. Rendall did not mention the arbitration provision in his complaint, which only contained general allegations of fraud in the performance of the contract on Merrill Lynch's part. Therefore, in line with *Shaw,* we regard Rendall's challenge to the arbitration clause alone and that the district court properly determined the arbitrability of the Agreement according to its terms.

## III. CONCLUSION

{32} We affirm.

{33} **IT IS SO ORDERED.**

WE CONCUR: JAMES J. WECHSLER and JONATHAN B. SUTIN, Judges.