2008-NMCA-108

191 P.3d 567

**In the Matter of the Estate of Gregoria C de Baca, Deceased.**

**Edwina CHAPMAN and Gilbert C de Baca, Plaintiffs–Appellants/Cross–Appellees,**

**v.**

**Vincent VARELA, Defendant–Appellee/Cross–Appellant.**

**and**

**In the Matter of the Estate of Gregoria C de Baca, Deceased.**

**Edwina Chapman and Gilbert C de Baca, Plaintiffs–Appellees,**

**v.**

**Viola Varela, Defendant–Appellant.**

**Nos. 27,069, 27,164.**

Court of Appeals of New Mexico.

June 25, 2008.

Certiorari Granted, No. 31,234, Aug. 11, 2008.

J. Ronald Boyd, Santa Fe, NM, for Edwina Chapman and Gilbert C de Baca.

Thomas A. Simons, IV, Faith Kalman Reyes, Simons & Slattery, LLP, Timothy Vidal, Canepa & Vidal, P.A., Santa Fe, NM, for Vincent Varela and Viola Varela.

**OPINION**

CASTILLO, Judge.

{1} In this case, we are required to consider whether the trial court properly concluded, by clear and convincing evidence, that a will was the product of undue influence. After reviewing the record, we hold that the party challenging the will did not establish a prima facie case of undue influence. We also consider whether the trial court properly granted a claim for slander of title and denied a claim for malicious abuse of process and whether the trial court properly handled attorney fees, costs, nominal damages, post-judgment interest, and actual damages. We affirm in part and reverse in part, and we remand for further proceedings.

## I. BACKGROUND

{2} Gregoria C de Baca died on May 11, 2004. She was survived by nine children: Rosina, Rudy, Viola, Simon, Tom, Daniel, Gilbert, Edwina, and Donna. On July 8, 2004, Gilbert and Edwina filed an application for informal appointment of personal representatives. The application asserts that Gregoria died intestate, and it requests that the trial court appoint Edwina and Gilbert to be the personal representatives of Gregoria's estate. On July 12, 2004, the trial court entered an order for informal probate of Gregoria's estate and appointed Edwina and Gilbert to be the personal representatives.

{3} Edwina and Gilbert also filed a complaint against Viola and her son, Vincent, and sought to set aside conveyances of real property from Gregoria to Viola and from Gregoria to Vincent. The complaint accused Viola and Vincent of either forging Gregoria's signature on the deeds or misleading Gregoria as to the effect of the deeds or exerting undue influence over Gregoria to induce her to sign the deeds. In the alternative, the complaint alleged that Gregoria suffered from "physical and/or mental illness and weakness of the mind." Edwina and Gilbert also filed a notice of lis pendens on July 29, 2004, and encumbered the five properties that Gregoria purportedly deeded to Viola and the one property that Gregoria allegedly sold to Vincent.

{4} On July 30, 2004, Viola filed a petition for formal probate of Gregoria's will and for the removal of Edwina and Gilbert as personal representatives of the estate. Viola's petition states that Gregoria's will nominated Viola to be the personal representative of the estate. After a hearing, the trial court revoked its earlier order and formally appointed Viola as the personal representative. The trial court also consolidated the probate proceeding with the complaint to set aside the conveyances.

{5} On August 25, 2004, Viola and Vincent filed an answer to the complaint, as well as counterclaims. The counterclaims accused

Edwina and Gilbert of slander of title, negligent and fraudulent misrepresentation, and abuse of process. The counterclaims also demanded punitive damages. On October 7, 2004, an amended response to the probate proceedings was filed, which named Gilbert, Edwina, Rudy, Daniel, Rosina, and Donna (Siblings) as respondents. Siblings withdrew their complaint to set aside the deed from Gregoria to Vincent on February 3, 2005. On April 7, 2005, Edwina and Gilbert released Vincent from the notice of lis pendens and discharged the encumbrance from Vincent's property.

{6} The bench trial began on April 25, 2005, and the trial court received evidence regarding (1) the application for informal appointment of a personal representative, (2) the petition for formal probate of the will, (3) the removal of previously appointed personal representatives and the formal appointment of a personal representative, (4) the response to the petition for formal probate of the will, (5) the petition challenging the will, (6) the complaint to set aside the conveyances of property from Gregoria to Viola and for damages for fraud, and (7) Viola's and Vincent's counterclaims. The trial continued on April 26, May 9, 10, and 11, and September 6, 7, and 8. On September 8, the trial court ruled from the bench that "Viola Varela clearly and convincingly exercised undue influence over her mother." The court set aside the will and the deeds, which conveyed property to Viola. The trial court did not rule at that time on Viola's and Vincent's counterclaims, but in the judgment issued on September 25, the court granted Vincent's claim for slander of title and dismissed the remaining counterclaims. It appears from the ruling and from later documents that the trial court found slander of title only against Edwina and Gilbert, not against Siblings. The court further removed Viola as the personal representative of the estate and ordered that the estate be administered intestate. After the trial court ruled from the bench, Viola and Vincent moved for, among other things, a partial stay of the probate proceeding in order to prevent the sale and distribution of Gregoria's property until after Viola and Vincent had an opportunity to appeal the trial court's determinations. The court granted the motion for a partial stay of the probate proceeding.

{7} On October 11, 2005, Vincent filed a motion with the trial court for a ruling on damages related to slander of title. No ruling followed the motion, and on March 27, 2006, Vincent filed a post-judgment request for an evidentiary hearing on damages pursuant to the final judgment. After the hearing, the trial court issued an order, which granted Vincent $16,731.44 in attorney fees as special damages and $12,000 in nominal damages. In addition, the trial court set a post-judgment interest rate of eight and three-fourths percent. Vincent submitted a bill of costs at a later date, and after another hearing on that issue, the trial court awarded Vincent costs in the amount of $5,355.05.

{8} Viola appeals the trial court's decision to set aside the deeds and the will, based on a claim of undue influence. Edwina and Gilbert also appeal the trial court's finding of slander of title and the determination of damages for that claim. Vincent cross-appeals and challenges the trial court's dismissal of his claim of malicious abuse of process, the amount of the award for attorney fees, and the rate used to calculate the amount of post-judgment interest. The appeals were consolidated by this Court, and we address each appeal in turn.

## II. DISCUSSION

### A. Viola's Appeal

{9} In order to provide context for this discussion, we provide a brief summary of the uncontested facts regarding the will and the five deeds. In September 2000, Gregoria suffered a stroke. During October or November 2000, Gregoria and Viola spoke with Lorenzo Dominguez, a surveyor, about preparing new deeds, which would transfer Gregoria's five pieces of property to Viola. In December 2000, Viola's daughter, Victoria, typed up the first will. Victoria testified that she and Gregoria sat together at a kitchen island while Viola made dinner in the same room. Victoria further testified that Gregoria dictated the words in the will and that Viola did not participate, unless Gregoria

used a Spanish phrase that Victoria did not understand.

{10} On January 25, 2001, Gregoria was again admitted to the hospital, this time for an ankle fracture. She was released on January 28 and was almost immediately readmitted for pneumonia. On February 2, Gregoria was released from the hospital again. Also on February 2, Robert J. Clifford at Berardinelli Family Funeral Services notarized the five warranty deeds and the first will, which was un-witnessed. The five deeds were recorded more than five months later, on July 24, 2001. On August 28, 2002, Gregoria executed a second will, which was drawn up by an attorney, Ruben Rodriguez. There is no question that this will was validly executed. This will left $1 to Gilbert, Edwina, Rosina, Tom, Simon, Daniel, Rudy, and Donna. The remainder of Gregoria's estate went to Viola through a residuary clause.

{11} With those facts as background, we turn to Viola's arguments on appeal. First, Viola contends that the trial court's judgment was not supported by clear and convincing evidence and that the deeds and the will were not the products of undue influence. Second, Viola insists that setting aside the deeds and the will would violate public policy because it "would deprive an older person of her free will to dispose of her assets in the manner in which she chooses." Since we conclude that the will was not the product of undue influence, we do not address the validity of the deeds.

{12} For more than two hundred years, the doctrine of undue influence has reflected "some of society's most deeply held values about obligations, family, property, and inheritance." Lawrence A. Frolik, *The Biological Roots of the Undue Influence Doctrine: What's Love Got to Do with It?*, 57 U. Pitt. L.Rev. 841, 843–44 (1996). "The underlying theory of the doctrine [of undue influence] is that the donor is induced by various means to execute an instrument that, in reality, is the will of another substituted for that of the donor." *Montoya v. Torres*, 113 N.M. 105, 110, 823 P.2d 905, 910 (1991). "Undue influence exists when [the] testator's volition at the time of [the] testamentary act was controlled by another and ... the result-

ing will was not the result of the free exercise of judgment and choice." *In re Estate of Gersbach*, 1998–NMSC–013, ¶ 8, 125 N.M. 269, 960 P.2d 811 (internal quotation marks and citation omitted). The purpose of the doctrine is to protect the intent of the testator; however, often "[t]he difficulty of proof arises from the fact that the will apparently carries out the wishes of the testator." Frolik, *supra*, at 851.

{13} Undue influence operates to invalidate an otherwise valid testamentary document. For this reason, scholars criticize the doctrine because it does not truly protect the intent of the testator but, instead, "protect[s] the testator's biological family from disinheritance." Ray D. Madoff, *Unmasking Undue Influence*, 81 Minn. L.Rev. 571, 577 (1997). In some cases, "the doctrine can ... deny freedom of testation for some individuals irrespective of the existence of substantial evidence that their will[s] represented their true wishes." *Id.* at 601. In order to protect testamentary freedom, our Supreme Court has instructed that although the courts may question a testator's decisions and question whether those decisions were unfair or unjust, "such questions do not require an answer," unless the evidence presented justifies "an inference that the gift was the result of improperly exerted influence." *In re Estate of Gersbach*, 1998–NMSC–013, ¶ 28, 125 N.M. 269, 960 P.2d 811. A testator's "motive or reasons need not be identified and proved." *Id.* Instead, "such evidence must do more than raise a suspicion. It must amount to proof, and such evidence has the force of proof only when circumstances are proven which are inconsistent with the claim that the will was the spontaneous act of the alleged testator." 1 *Bancroft's Probate Practice* § 210, at 518 (2d ed. 1950).

{14} New Mexico has not "state[d] a legal definition of undue influence." *In re Estate of Gersbach*, 1998–NMSC–013, ¶ 8, 125 N.M. 269, 960 P.2d 811 (internal quotation marks and citation omitted). Instead, a party contesting a conveyance must establish a prima facie case and show (1) that a confidential or fiduciary relationship existed between the testator and the beneficiary and

(2) that suspicious circumstances existed. *Id.* ¶¶ 8–9. A presumption of undue influence arises if the contesting party successfully establishes the prima facie case. *Id.* ¶ 9. However, the inquiry does not end there. Once the presumption is raised, the proponent of the will may still be able to rebut the presumption. *Id.* "Evidence sufficient to rebut the presumption must at least balance the prima facie showing of undue influence." *Montoya,* 113 N.M. at 111, 823 P.2d at 911.

 {15} Undue influence must be established by clear and convincing evidence. *In re Estate of Gersbach,* 1998–NMSC–013, ¶ 9, 125 N.M. 269, 960 P.2d 811. We will consider the evidence in the light most favorable to the prevailing party, *id.* ¶ 10, but we also bear in mind that "[c]lear and convincing evidence is evidence that instantly tilt[s] the scales in the affirmative when weighed against the evidence in opposition and the fact finder's mind is left with an abiding conviction that the evidence is true." *In re Locatelli,* 2007–NMSC–029, ¶ 7, 141 N.M. 755, 161 P.3d 252 (second alteration in original) (internal quotation marks and citation omitted). However, "[e]ven in a case involving issues that must be established by clear and convincing evidence, it is for the finder of fact, and not for reviewing courts, to weigh conflicting evidence and decide where the truth lies." *State ex rel. Dept. of Human Services v. Carol W.,* 108 N.M. 332, 335, 772 P.2d 366, 369 (Ct.App.1989). But conflicting evidence cannot be based on argument of counsel that amounts to nothing more than speculation and conjecture. *See State v. Benton,* 118 N.M. 614, 615–16, 884 P.2d 505, 506–07 (Ct.App.1994). We begin by considering whether a confidential relationship existed between Viola and Gregoria.

**1. Confidential or Fiduciary Relationship**

 {16} "For purposes of undue influence, in New Mexico, [a] confidential or fiduciary relationship exists when one person places trust and confidence in the integrity and fidelity of another." *In re Estate of Gersbach,* 1998–NMSC–013, ¶ 11, 125 N.M. 269, 960 P.2d 811 (alteration in original) (internal quotation marks and citation omitted). The trial court found that "[a] confidential/fiduciary relationship existed between Gregoria C de Baca and Viola Varela." Viola acknowledges that "there may have been" a confidential relationship between herself and her mother. As Siblings point out, Viola and Gregoria shared a joint checking account, the bank used Viola's mailing address, Viola attended most of Gregoria's doctor's appointments, Viola was with Gregoria almost every day, and Viola took Gregoria to have the will prepared. We conclude that there was substantial evidence to support the trial court's finding that Viola and Gregoria shared a confidential relationship. *See id.* ¶ 12 (finding a confidential relationship because of the following: the donor and the donee were close friends, they spoke on the phone often, the donee payed minimal rent without a written lease, and the donee received loans from the donor without any schedule for repayment). We now turn to the record to evaluate whether suspicious circumstances existed surrounding the will.

**2. Suspicious Circumstances**

 {17} Suspicious circumstances include

(1) old age and weakened physical or mental condition of [the] testator; (2) lack of consideration for the bequest; (3) unnatural or unjust disposition of the property; (4) participation of [the] beneficiary in procuring the gift; (5) domination or control over the donor by a beneficiary; and (6) secrecy, concealment, or failure to disclose the gift by a beneficiary.

*Montoya,* 113 N.M. at 110, 823 P.2d at 910. "This is not an exhaustive list, nor is it a list of circumstances that are always suspicious. Furthermore, the presence of any of these circumstances is not in itself dispositive." *In re Estate of Gersbach,* 1998–NMSC–013, ¶ 8, 125 N.M. 269, 960 P.2d 811. The issue is whether the testator's intent was improperly influenced by another person. We consider the existence of suspicious circumstances not as ends in themselves but as clues in discovering the testator's intent. This Court has previously acknowledged that "[w]here the testamentary intent of the maker of a document is uncertain or doubtful the fact finder must determine the intention of the maker

from all of the evidence." *Benton v. Albuquerque Nat'l Bank*, 103 N.M. 5, 11, 701 P.2d 1025, 1031 (Ct.App.1985). We observe that the trial court made a finding that "[t]he testimony of Viola Varela was impeached at trial," and we will therefore disregard her testimony. *See Galvan v. Miller*, 79 N.M. 540, 547, 445 P.2d 961, 968 (1968). The trial court made findings regarding the individual suspicious circumstances, and we address them individually.

### a. Old Age or Weakened Mental Condition

■■■ {18} We note at the outset that "issues of mental capacity and undue influence are separate and distinct." *Roybal v. Morris*, 100 N.M. 305, 311, 669 P.2d 1100, 1106 (Ct.App.1983). This Court examines a testator's mental and physical conditions for evidence that those conditions exposed the testator to the undue influence of others. *See In re Estate of Gonzales*, 108 N.M. 583, 585, 775 P.2d 1300, 1302 (Ct.App.1988). The trial court made the following findings regarding Gregoria's mental and physical health:

6. In the last few years of her life, Gregoria C de Baca suffered several medical illnesses including hip replacements on both sides, a st[r]oke, a broken ankle, a broken elbow, a broken femur, pneumonia, high blood pressure, congestive heart failure and hearing loss.

7. In [her] last few years Gregoria C de [B]aca also suffered from age[-]related and stroke[-]related loss of cognitive functioning and memory loss.

Although there was evidence at trial to support these findings, we conclude that the findings do not support an inference of suspicious circumstances regarding Gregoria's susceptibility to influence because both findings relate to Gregoria's general decline after her stroke. "No New Mexico case has based a presumption of undue influence on the fact that the testator was elderly without evidence that the testator's age had affected his or her mental ability." *In re Estate of Gonzales*, 108 N.M. at 585–86, 775 P.2d at 1302–03 (observing that the testator "was elderly and sick, but this is not unusual or reason to cause suspicion"). There is no evidence in the record or the findings that Gregoria's old age and declining health made her particularly susceptible to Viola's influence. *Cf. In re Will of Ferrill*, 97 N.M. 383, 387–88, 640 P.2d 489, 493–94 (Ct.App.1981) (finding suspicious circumstances when a doctor testified that the testator's medical condition made her susceptible to influence). We therefore hold that there was insufficient evidence to justify an inference that either Gregoria's age or her health is a suspicious circumstance.

### b. Unnatural or Unjust Disposition

■■■ {19} An unnatural devise

is one in which the testator leaves a portion of his or her estate to someone not the natural object of one's bounty, someone to whom the testator would not have been expected to devise his property. A "natural disposition" has been defined as one "which provides for a testator's heirs at law...."

*In re Estate of Gersbach*, 1998–NMSC–013, ¶ 24, 125 N.M. 269, 960 P.2d 811 (citations omitted). The trial court found that "[t]he [l]ast [w]ill [a]nd [t]estament which gave all of Gregoria C de Baca's substantial estate to Viola Varela and essentially nothing to her remaining eight children was an unusual and unnatural disposition." The devise in the present case does not fit easily into the traditional definition of an unnatural gift because although Viola is a natural object of Gregoria's bounty, so were the other eight children, who were effectively disinherited. The estate was not equally distributed among Gregoria's children, as would have happened had Gregoria died intestate. However, a valid will cannot be set aside based merely on evidence that the testator did not provide for her heirs at law in the manner provided by the intestacy statutes. *See* Madoff, *supra*, at 590–91. As with all of the other factors that we consider in order to evaluate suspicious circumstances, the nature of the devise must be relevant to the intent of the testator and not simply be a reversion to the dictates of the intestacy statutes. *See In re Estate of Gersbach*, 1998–NMSC–013, ¶ 30, 125 N.M. 269, 960 P.2d 811 ("We cannot speculate about motive or reasons ... without jeopardizing the principle of testamentary freedom.

Otherwise, any significant testamentary gift outside the class of intestate takers would be vulnerable to a contest on the basis of undue influence." (citation omitted)). We therefore require evidence that the division of property did not reflect the intent of the testator, evidence that Gregoria wanted to distribute her property differently from what was accomplished by the will.

{20} We initially note that at trial, Siblings tendered expert testimony on the nature of the disposition. Siblings asked a probate attorney, Fletcher Catron, whether the will was a natural disposition of Gregoria's estate. He provided the following response: "I don't believe that it is. I have seen other dispositions that are similar to this one, but, no, I would say that it is an uncommon distribution." Catron was not asked—nor would he have been able—to provide evidence regarding Gregoria and her intentions when she distributed her property. This testimony does not answer the key question: What did Gregoria intend?

{21} In order to determine whether a will is an unnatural devise, some courts look to a previous will or the previously stated intentions of a testator. *See id.* ¶ 25; *see also Doughty v. Morris,* 117 N.M. 284, 289–90, 871 P.2d 380, 385–86 (Ct.App.1994) (evaluating "the unequal disposition of [the testator's] property which was contrary to [the testator's] intent that her estate be shared equally" in order to support a finding of undue influence); *Roybal,* 100 N.M. at 310, 669 P.2d at 1105 (considering evidence that the testator had previously stated "that it was his intention to leave his property equally to both" parties). Initially, we observe that there is no evidence at all that Gregoria intended to divide her property among all nine children. Four of the siblings testified that Gregoria had expressed an intention to leave the family home to Gilbert. A neighbor and distant relation, Donald C de Baca, also testified that Gregoria "said this place belonged to Gilbert." Additionally, there was testimony that at one time, Gregoria intended to leave a different parcel of property to Donna.

{22} Gregoria's expressed intentions about future events have less impact, however, than her actions during life. Indeed, much of Gregoria's money and property was dispersed to her children during her lifetime, as was reflected in the will. When Gregoria decided that she wanted to give Rudy a piece of property, she deeded that property to Rudy. Gregoria made Simon a $5,000 loan, which he never repaid. Beginning in 1991, after the bank foreclosed on Gilbert's house, he lived in Gregoria's home without paying rent. Before the foreclosure proceeding, Gregoria helped Gilbert financially and was only partially repaid. Gregoria loaned Daniel $30,000, little of which was repaid, and she also loaned small amounts of money to Rosina and babysat Rosina's children.

{23} At the same time that Siblings tried to show that Gregoria had expressed intentions for her property that were different from those expressed in the will, Siblings also presented a great deal of evidence to support the conclusion that when Gregoria wanted to make a gift, she made it. The *In re Estate of Gersbach* Court noted that "evidence of what a prior will provided is of limited utility in evaluating the validity of provisions in a subsequent will." 1998–NMSC–013, ¶ 25, 125 N.M. 269, 960 P.2d 811. We conclude that Siblings' testimony regarding Gregoria's previously stated intentions neither establishes that Gregoria's failure to provide gifts for all of her children should raise a presumption of improper influence nor establishes that Gregoria's previously stated intentions suggest impropriety.

{24} Considering the evidentiary force of previously expressed intentions, the trial court also found that "the [w]ill w[as] at variance with the previous declarations and known affections of Gregoria." The will specifically excludes each child, except Viola, and provides a reason for the exclusion. Nevertheless, Siblings insist that there is no explanation for their exclusion from the will. In support of their contention that the will did not evidence Gregoria's intent, Siblings testified that many of the statements made in the will were not true. The will states that Rosina had "virtually no contact" with Gregoria for twenty years, but Rosina testified that she saw her mother often.

{25} The will explains that Gregoria had "loaned [Dan] money when he needed it and [that] all loans are now considered repaid." Dan borrowed $30,000 from his mother, and he testified that it was Viola who "specifically told [him that he] didn't have to pay it back." According to Dan, his mother never referred to the loan as an inheritance. The will berates Gilbert for "liv[ing]" at [her] house for about 15 years [without] ma[king] any attempt to pay even one utility bill or rent for his room." Gilbert testified that he "would offer [his mother] money and [that] she would say that [his] father left her more than what she would ever need and not to worry about it." The will continues and charges that Gilbert "was also very moody at times and would not speak to [Gregoria]." At trial, Gilbert explained that he and his mother "had a lot of conversations alone." Finally, the will declares that Gilbert "never appreciated what [Gregoria] did for him." Gilbert insisted, "She always told me she appreciated me, and I always told her I appreciated her." He continued as follows: "We worked with each other. We were there for each other."

{26} The trial court determined that the disposition was unnatural, and Siblings presented a great deal of testimony to establish that the sentiments expressed in the will did not adequately reflect their relationship with their mother. Nevertheless, we observe that although Siblings provided evidence that they maintained excellent relationships with their mother, this evidence does not provide insight into Gregoria's intentions regarding her property. *See In re Estate of Keeney*, 121 N.M. 58, 62, 908 P.2d 751, 755 (Ct.App. 1995) (noting that a suspicious circumstance was established when the contestant provided some linkage between the evidence and purported undue influence). There is no evidence that Gregoria intended to divide her property equally among her children such that the presumption of undue influence would be raised by her failure to do so. Accordingly, we conclude that the evidence did not support the trial court's findings that the division of property was unnatural.

### c. Procurement

{27} The trial court found that "Viola Varela was directly involved in the procurement of the [w]ill." Our review of the record, however, reveals that there was insufficient evidence to support this finding. *In re Estate of Gonzales* addressed the issue of procurement, and this Court concluded that in order for there to be a suspicious circumstance, there must be "participat[ion] in procuring the will by securing its execution." 108 N.M. at 586, 775 P.2d at 1303. In that case, a beneficiary took a testator to an appointment for executing a will, and the beneficiary also acted as a witness to the will. *Id.* This Court determined that the beneficiary's presence at the execution of the will was evidence related to the confidential relationship between the parties, not to suspicious circumstances. *Id.* In addition, although the beneficiary signed the will, that signature was not necessary for its execution. *Id.* The Court therefore held that "[i]t cannot be said that [the beneficiary] participated in procuring the will by securing its execution when his signature was unnecessary." *Id.* We additionally note that the term "procurement" is defined as "[t]he act of getting or obtaining something." *Black's Law Dictionary* 1244 (8th ed. 2004). Thus, in order for Siblings to show that Viola participated in the procurement of the will, they had to provide evidence that she became the beneficiary of the will by securing its legal execution. We point out that in the present case, there were two wills created and that only the second was properly executed and valid. Because the suspicious circumstance of procurement is specific to legal execution of a document or transfer, we only consider Viola's participation in the execution of the second, valid will.

{28} The first will was typed by Viola's daughter, Victoria, in December 2000, and that will was notarized on February 2, 2001. Sometime after the first will was notarized, Gregoria and Viola looked for an attorney to make sure that the first will was "correctly done." After visiting two other attorneys, Viola then made an appointment for her mother to see Ruben Rodriguez, an attorney whom Viola had met when both she and Rodriguez worked for the City.

{29} Viola drove her mother to the appointment, and Viola was in the room with

her mother and Rodriguez during the first meeting. Rodriguez informed the women that the first will was not properly executed and that a second will was necessary. The billing statement for Rodriguez's work was sent to Viola. She was not, however, in the room when Gregoria executed the will. Rodriguez gave the following testimony:

> When Mrs. C de Baca came to my office to sign the will and other documents, I had her come into my office by herself. Viola walked in with her and then I told Viola to step out because I knew that the will affected her directly and I didn't want her to be in the same room while [Gregoria] was executing her will because I was going to ask her some questions.

These facts do not support an inference of misconduct on Viola's part in relation to the procurement of the second will; instead, they imply that Gregoria could not drive herself to appointments. Viola made the appointment for her mother, and Viola made sure that Gregoria was able to get to Rodriguez's office. There is no evidence that Viola's participation was necessary for the legal execution of the will. *See In re Estate of Gonzales*, 108 N.M. at 586, 775 P.2d at 1303 (concluding that a beneficiary could not be said to have participated in procuring a will when his actions were not necessary to prove due execution). There is also no evidence that Viola's actions relating to the execution of the will influenced Gregoria's stated intent in the document.

{30} We have already explained that if Siblings successfully raise a presumption of undue influence, the burden shifts to Viola to present "evidence to meet or rebut the presumption, not carry the burden of persuasion on the existence of the presumed fact." *Montoya*, 113 N.M. at 111, 823 P.2d at 911. After reviewing the record and based on the evidence presented and explained above, we conclude that Siblings did not prove that Viola improperly participated in the procurement of the will.

### d. Domination or Control over the Donor

{31} In *Hummer v. Betenbough*, 75 N.M. 274, 404 P.2d 110 (1965), our Supreme Court considered a will signed by an elderly woman, and the Court determined that the will was the product of the undue influence of the testator's brothers. *Id.* at 283–85, 404 P.2d at 117–18. The *Hummer* Court noted the following facts:

> [The] decedent was 72 years of age when she made the will in question and that she was dominated and coerced by her brothers to the point that she was afraid of them, even when not in their presence.... There is evidence that [the] decedent was easily influenced, made no independent suggestions herself, agreed with anything anyone stated to her, and ... agreed with what the last person to talk to her had to say.... [S]he was apparently so dominated by her brothers that ... she was thoroughly convinced as to what her will should contain.

*Id.* at 283–84, 404 P.2d at 117. Siblings likewise argue that Viola dominated Gregoria and influenced her to execute the will that did not reflect her intentions. The trial court made the following findings regarding Viola's control and influence over Gregoria:

> 11. Viola Varela used her position of confidence and power to her advantage to influence and control the actions and decisions of Gregoria C de Baca.
>
> ....
>
> 17. Viola Varela had an assertive and domineering personality. Gregoria C de Baca was submissive when around Viola.
>
> 18. Viola Varela attempted to poison the relationship between Gregoria C de Baca and her other children by making disparaging and derogatory remarks about them and attempting to restrict their access to Ms. C de Baca.

{32} A number of family members testified that Gregoria would become more subdued whenever Viola was present. Edwina and Joan, Rudy's wife, also testified that Viola would often speak for Gregoria or answer questions for her. Individual siblings further testified that Viola often made disparaging remarks about the other siblings. Rosina testified that when she would encounter Gregoria and Viola in public, Viola would "turn around and start yelling at [Gregoria, 'T]here is Rosina[;] she's not talking to you.' " Daniel

testified that "there were times [when he] would hear Viola[—]sitting next to [Gregoria] in the front living room[—]saying that Gilbert was stealing everything he could from her." None of this evidence rises to the level of dominance found in *Hummer*. There is no indication that Gregoria was afraid of Viola or that Viola induced Gregoria to believe things that she otherwise would not have believed. Indeed, Gregoria was apparently unaffected by Viola's animosity toward the others. Regardless of Viola's comments, Gregoria spent significant time with each of her children, before and after the will was executed. Gregoria's continued relationships with her other children suggest that Viola did not control or dominate her mother's feelings and relationships.

{33} In addition, non-family members did not notice a controlling dynamic between Viola and Gregoria during numerous medical visits and public outings. Dr. Gabriela Muñoz, a clinical psychologist, created a report based on an interview with Gregoria, and the report stated the following: "[Q]uestioning reveals that Mrs. C de Baca knows and understands the meaning and the purpose of executing a[w]ill and/or signing a property deed. She is also aware that she has deeded all of her real estate properties to her daughter[ ] Viola." Though it is unclear as to whether Viola was present when Gregoria made these statements, Dr. Muñoz testified that Viola did not coach Gregoria during the interview and that Gregoria provided all of the answers to Dr. Muñoz's questions. Specifically, Dr. Muñoz explained that she "didn't talk to Viola" and, instead, that "all the information [came] from Mrs. C de Baca."

{34} Dr. Justina Trott, Gregoria's physician for many years, also testified that Viola and Gregoria had a good relationship. Dr. Trott explained, "I certainly have patients whose family brings them in who prefer to be talked with alone and make that known to me or who confide that they're concerned about their children meddling in their affairs." Dr. Trott continued, "There [was] never any conversation or suggestion that that was the case with Gregoria."

{35} Siblings also presented testimony that Viola exercised control over Gregoria in order to prevent her from securing independent representation. Siblings testified that after they discovered the deeds in Viola's name, they showed the deeds to Gregoria. Gilbert, Edwina, and Rudy testified that Gregoria denied having signed the deeds and that Gregoria wanted her property back in her own name. Siblings took Gregoria to a number of attorneys in order to try to put the property back into Gregoria's name. The final visit was to attorney Cheryl Sommer, who testified that she was retained by Gregoria in order to investigate the deeds and retrieve the property. Sommer further testified that Gregoria expressed a desire to get her property back.

{36} Sommer sent a letter to Viola on January 28, 2003, and requested that Viola return the property to Gregoria. A couple of weeks later, on February 10, Sommer reviewed a note from Gregoria, which terminated Sommer's services. The note was delivered to Sommer's office by Vincent, and Siblings acknowledge that the note was in Gregoria's handwriting. A day or two later, Siblings and Gregoria kept an appointment with Sommer, and the testimony indicated that Gregoria did not mention that she had fired Sommer. With this evidence, Siblings suggested that Gregoria attempted to hire Sommer to get the property back, that Viola became aware of the attorney's involvement, and that Viola induced Gregoria to fire Sommer before Sommer could interfere with the deeds.

{37} Even if Viola influenced Gregoria's decision to fire Sommer, we do not believe that evidence supports a further inference that Viola manipulated Gregoria into making a will that did not reflect her intentions. Dr. Muñoz evaluated Gregoria in March 2003, after Gregoria had hired and fired Sommer. During this evaluation, Gregoria independently reiterated the sentiments in the will. Dr. Muñoz testified that Viola did not coach Gregoria during the interview and that Gregoria provided all of the information about the will.

{38} Siblings additionally argue that "Gregoria did not participate at all in the prepara-

tion of the [first] will." Rodriguez testified that when Viola and Gregoria visited him to execute the second will, Gregoria wanted to copy exactly the language from the first will into the second will. Indeed, the language in the two wills is nearly identical. Siblings use inconsistencies in the testimony of Viola and Victoria to show that Gregoria did not author the first will and that the intentions expressed in the second will are therefore also not Gregoria's. We do not believe that these inconsistencies shed light on Gregoria's intent. Questions about whether there was a rough draft, who typed the first page, the tense of the verbs used, and whether standard testamentary language was copied from a form will do not help us to discern the ultimate issue—whether Gregoria intended the distribution of her property that is set out in the will.

{39} In further support of the contention that Viola controlled the drafting and execution of the will, Siblings argue that "[w]hat likely happened" in Rodriguez's office was the following: "[W]hen Mr. Rodriguez asked Gregoria what [she] want[ed] to do, Viola answered for her: 'My mother wants to do the new will the same as the old one.' Gregoria was sitting right there and seemed to be in agreement, but she probably didn't hear what was said." We are unwilling to speculate about "what likely happened." Rodriguez testified that he went over the will with Gregoria, out of Viola's presence, before the will was executed. Specifically, Rodriguez said that he read the will to Gregoria. It is undisputed that Gregoria suffered from severe hearing loss after her stroke and that a person had to speak directly into her right ear in order for Gregoria to hear. On cross-examination, however, Rodriguez stated that he did not notice that Gregoria had any hearing difficulty. Rodriguez's failure to notice that Gregoria had difficulty hearing is not evidence that Viola dominated or influenced her mother to execute the second will. To the contrary, Rodriquez testified, "Everything that is in the will, either [Gregoria] told me verbally what she wanted to do or I copied from the information that was in the original will that she wanted to replace." Rodriguez also testified that Gregoria "went over the will with [him], item by item," and

that Viola "did not say very much after [Gregoria] started talking to [him]."

{40} In *Hummer*, the will proponent offered the testimony of the drafting attorney in order to establish that there was no undue influence. 75 N.M. at 284, 404 P.2d at 117. Our Supreme Court interpreted the attorney's testimony to indicate that "if undue influence were exerted on [the] decedent, [the attorney] had no knowledge of such influence." *Id.* at 285, 404 P.2d at 118. As a result, the attorney's testimony was insufficient to rebut all of the other evidence that was presented to establish undue influence. *Id.* In the present case, however, Rodriguez affirmatively testified that Gregoria told him what she wanted the will to say. In addition, there is also the testimony of Gregoria's doctor and Dr. Muñoz, neither of whom noticed dominance or control. Dr. Muñoz also testified that Gregoria reiterated her wishes regarding the property.

{41} Siblings failed to establish that Viola controlled or dominated Gregoria to the extent that Gregoria was compelled to draft the will to benefit Viola. There is no evidence that Gregoria was afraid or confused, that Gregoria was easily influenced by Viola, or that Gregoria did not know or understand the contents of the will. Consequently, we hold that there was insufficient evidence to support the conclusion that Viola controlled or dominated her mother such that the will was not the result of Gregoria's intentions.

e. **Secrecy**

{42} In the case *In re Estate of Gersbach*, our Supreme Court explained that "the failure to disclose a gift or secrecy by a beneficiary is a suspicious circumstance." 1998–NMSC–013, ¶ 14, 125 N.M. 269, 960 P.2d 811. Siblings were required to show that Viola "had knowledge of the devise and kept it a secret." *Id.* The trial court made the following finding: "Viola Varela was secretive. She did not keep Gregoria C de Baca or her brothers and sisters informed of some actions taken concerning the properties and assets of Gregoria C de Baca." There is no question that Viola had knowledge of the devise. Further, during cross-examination,

Viola was asked whether she "ke[pt her] brothers and sisters informed of the various documents that ha[d] been admitted into evidence, the two powers of attorney, two medical directives, two wills and five deeds." Viola responded as follows: "No, I didn't. My mother always requested that whatever those documents involved were between me and her, and not to discuss it with anyone else." We note again that the trial court found that Viola's testimony was impeached; therefore, we do not credit the assertion that Gregoria told Viola not to discuss the will. We will, however, consider whether the secrecy regarding the devise furthers the inquiry into Gregoria's intent.

{43} Secrecy is most relevant as a suspicious circumstance in situations like that found in *Doughty.* In that case, a son convinced his mother to transfer property into his name while she was in the hospital. 117 N.M. at 286–87, 871 P.2d at 382–83. The mother's will devised her property equally between her two children; however, after the son's transfers, no property remained in the estate. *Id.* at 286, 871 P.2d at 382. The son did not tell his sister that the property had been transferred until after the mother died. *Id.* at 287, 290, 871 P.2d at 383, 386. In *Doughty,* the court concluded that "[t]he secrecy and concealment of these transfers is suspicious and supports the trial court's finding of undue influence." *Id.* at 290, 871 P.2d at 386.

{44} In the present case, while it is clear that Viola did not tell her siblings about the will, it is not clear that this secrecy is indicative of undue influence. The effect of the will is in the residuary clause, which devises all of Gregoria's remaining property to Viola. This outcome was also achieved when Gregoria deeded the five properties to Viola in July 2001. Siblings discovered these deeds in 2002. The result is that Siblings had notice that the property was in Viola's hands, and after the unsuccessful visit to Sommer, Siblings took no action to regain the property. In *Doughty,* the fact of secrecy helped this Court determine whether the transfer was not the mother's intention. In order to prevent the sister from directly confronting the mother with the transfer, the brother did not

tell the sister about the transfer. We do not have that scenario in the present case. In fact, we do not see how secrecy is a relevant factor in this case at all because Siblings had knowledge of the transfer of property and confronted Gregoria about the deeds.

### f. Consideration

{45} Our Supreme Court has indicated that "the existence of consideration may help rebut a presumption of undue influence." *In re Estate of Gersbach,* 1998–NMSC–013, ¶ 21, 125 N.M. 269, 960 P.2d 811. Though it is clear that Viola paid no money for the property, she contends that "in exchange for all that Viola had done for [Gregoria], she deeded Viola the property." Though Siblings testified that everyone helped to take care of Gregoria, Viola also spent a great deal of time taking care of Gregoria. Edwina testified as follows: "Viola and I would alternate days or we would do days together. . . . At the hospital, Viola and I would spend the nights at the hospital taking turns." Dr. Trott testified as follows:

> To the best of my recollection, Viola . . . was the only person to accompany [Gregoria] to my office or to call my office regarding her mother's health over the last approximately 17 years, and [Gregoria] often remarked to me how much she enjoyed being with her daughter and how much [Gregoria] relied upon her.

Dr. Muñoz's report indicates that Gregoria said she wanted Viola to have the property because "[s]he is the one who is always by [Gregoria]." *In re Estate of Gersbach* observed that "a friendship of long standing may help prevent a presumption of undue influence from arising," *id.* ¶ 21, and we agree.

### 3. Presumption of Undue Influence

{46} In order to give rise to a presumption of undue influence, "the evidence must justify an inference of misconduct, which produced a desired or foreseeable result." *Id.* ¶ 29. As we have discussed, there was evidence to support a confidential relationship. However, the *In re Estate of Gersbach* Court, in over-

turning a finding of undue influence, stated the following:

> In order to uphold the ... judgment [of undue influence], we would need to conclude that, viewing the evidence in the light most favorable to [the contestant], a reasonable fact finder could find clear and convincing evidence that the testator made a gift he would not have made absent improper influence.

*Id.* ¶ 31.

{47} Although Siblings presented a great deal of evidence that appears to satisfy the elements of undue influence, closer examination reveals that very little of the testimony and evidence is relevant to the determination of Gregoria's intent. The evidence regarding old age, unnatural disposition, domination, and secrecy did not establish that Viola substituted her own intent for Gregoria's. We further concluded that Viola did not participate in the procurement of the will and that there is some evidence that Viola provided consideration in the form of love, friendship, and help with daily living. In light of this evidence, we are not convinced that there was sufficient evidence for the trial court to develop an abiding conviction that the will was the product of undue influence and that as a result, the will did not express Gregoria's intentions for her property. In the case *In re Estate of Gersbach,* 1998–NMSC–013, ¶¶ 29–30, 125 N.M. 269, 960 P.2d 811, the trial court found a confidential relationship and some suspicious circumstances on evidence that is comparable to the evidence in this case. Our Supreme Court reversed, and based on a comparison of the facts in that case to the facts in the case before us now, we are compelled to do the same. *Id.* ¶ 31. Accordingly, we hold that Siblings failed to present clear and convincing evidence that Gregoria would not have executed the will absent improper influence from Viola. We reverse the trial court's conclusion that the will was the result of undue influence by Viola.

**B. The Remaining Appeals**

{48} We will consider the appeal of Edwina and Gilbert together with the cross-appeal of Vincent because many of their issues are interrelated.

**1. Malicious Abuse of Process and Slander of Title**

{49} The trial court made the following finding:

> At the time the civil complaint was filed, [Edwina Chapman and Gilbert C de Baca] knew full well that Vincent Varela had purchased the Magdalena Street property from [Gregoria C de Baca] and that two mortgages to that effect were recorded and were matters of public record. [Edwina Chapman and Gilbert C de Baca's c]omplaint against Vincent Varela was improper. Their demands for countless documents were not only unnecessary, time[-]consuming[,] and expensive, but were unproductive other than to confirm the sale. The only purpose for the filing of the lis pendens was to place a cloud on the title and [it] was done [with] an ulterior motive.

As a result of this finding, the trial court granted Vincent's claim for slander of title but dismissed the claim for malicious abuse of process. Vincent argues that the finding supports both slander of title and malicious abuse of process. Edwina and Gilbert insist that there was no evidence at trial to support either slander of title or malicious abuse of process.

{50} We first consider Edwina and Gilbert's argument that the trial court's conclusion of slander of title was not supported by the findings of fact. Vincent argues that Edwina and Gilbert did not properly appeal the trial court's determinations regarding slander of title because Edwina and Gilbert appealed the trial court's order on damages, rather than the corrected final order. We are not persuaded. Though it is true that the notice of appeal refers to the order on damages, that order also included the following finding: "The [c]ourt granted Vincent Varela's counterclaim for slander of title and retained jurisdiction only to consider damages on Vincent Varela's slander of title claim." The ruling on slander of title was not appealable until the trial court determined the award for damages. *See Prin-*

*cipal Mut. Life Ins. Co. v. Straus,* 116 N.M. 412, 414, 863 P.2d 447, 449 (1993). We conclude that the appeal of the order on damages was sufficient to encompass the trial court's ruling on slander of title. Vincent also argues that Edwina and Gilbert did not properly preserve their arguments challenging the slander of title ruling. After examining the record, we are satisfied that Edwina and Gilbert correctly challenged Vincent's slander of title claim in their motion for summary judgment and that the trial court was alerted to the relevant legal issues. *See Murken v. Deutsche Morgan Grenfell, Inc.,* 2006–NMCA–080, ¶ 10, 140 N.M. 68, 139 P.3d 864.

{51} This Court has previously held that "[s]lander of title occurs when one who, without the privilege to do so, willfully records or publishes matter which is untrue and disparaging to another's property rights in land as would lead a reasonable man to foresee that the conduct of a third purchaser might be determined thereby." *Vill. of Wagon Mound v. Mora Trust,* 2003–NMCA–035, ¶ 74, 133 N.M. 373, 62 P.3d 1255 (internal quotation marks and citation omitted). In *Superior Construction, Inc. v. Linnerooth,* 103 N.M. 716, 712 P.2d 1378 (1986), our Supreme Court established that "the filing of a lis pendens is absolutely privileged and cannot support an action for slander of title." *Id.* at 720, 712 P.2d at 1382. The *Linnerooth* Court also noted that it is "[o]nly in extreme cases [that] a publication made in connection with a judicial proceeding [will] serve as the basis for a defamation action." *Id.* at 719, 712 P.2d at 1381 (alterations in original) (internal quotation marks and citation omitted). The only publications by Edwina and Gilbert that are supported by the trial court's findings or the evidence presented at trial are the notice of lis pendens and the filing of the cause of action. Neither is sufficient to support a cause of action for slander of title.

{52} Vincent attempts to distinguish between a suit filed for slander of title and a counterclaim based on slander of title. Vincent cites *Ruiz v. Varan,* 110 N.M. 478, 479 n. 1, 797 P.2d 267, 268 n. 1 (1990) (emphasis omitted), for the proposition that the New Mexico courts have not yet addressed "the

question whether a counterclaim for abuse of process or slander of title can properly be filed in response to the complaint on which the lis pendens is based." *Ruiz,* however, does not decide the issue, and Vincent does not explain why a counterclaim for slander of title would be an example of the "kinds of extreme circumstances that allow for a defamation action arising from publication of material in a judicial proceeding." *Linnerooth,* 103 N.M. at 719, 712 P.2d at 1381. We will not consider the issue because it is not supported by argument and authority. *See In re Adoption of Doe,* 100 N.M. 764, 765, 676 P.2d 1329, 1330 (1984) ("We have long held that to present an issue on appeal for review, an appellant must submit argument *and authority* as required by rule."). We hold that the trial court erred in concluding that the findings of fact supported a claim for slander of title.

{53} Next, we turn to Vincent's contention that the trial court mistakenly dismissed his claim for malicious abuse of process. Malicious abuse of process consists of the following elements:

> (1) the initiation of judicial proceedings against the plaintiff by the defendant; (2) an act by the defendant in the use of process other than such as would be proper in the regular prosecution of the claim; (3) a primary motive by the defendant in misusing the process to accomplish an illegitimate end; and (4) damages.

*DeVaney v. Thriftway Mktg. Corp.,* 1998–NMSC–001, ¶ 17, 124 N.M. 512, 953 P.2d 277, *abrogated on other grounds, Fleetwood Retail Corp. of N.M. v. LeDoux,* 2007–NMSC–047, ¶ 30, 142 N.M. 150, 164 P.3d 31. "The second element—misuse of process—can be shown in one of two ways: (1) filing a complaint without probable cause, or (2) an 'irregularity or impropriety suggesting extortion, delay, or harassment.'" *Fleetwood,* 2007–NMSC–047, ¶ 12, 142 N.M. 150, 164 P.3d 31 (citing and quoting *DeVaney,* 1998–NMSC–001, ¶¶ 22, 28, 124 N.M. 512, 953 P.2d 277). Vincent argues that the evidence at trial supported the conclusion that Edwina and Gilbert "misuse[d] . . . the power of the judiciary [with] a malicious motive," *DeVaney,* 1998–NMSC–001, ¶ 17, 124 N.M. 512,

953 P.2d 277, by filing a complaint against Vincent that alleged that he did not pay Gregoria for the property. We agree.

{54} As a matter of law, the findings of the trial court support all four elements of malicious abuse of process, and our review of the record persuades us that those findings were supported by substantial evidence. Edwina and Gilbert filed a civil complaint against Vincent, which satisfied the first element. The second element is fulfilled if Edwina and Gilbert filed the complaint without "probable cause," which is defined as "the reasonable belief, founded on known facts established after a reasonable pre-filing investigation, that a claim c[ould] be established to the satisfaction of a court or jury." *Id.* ¶ 22 (citation and footnote omitted). The trial court found that Edwina and Gilbert knew that Vincent had legitimately purchased the property from Gregoria and that their complaint was improper. The trial court further found that the subsequent demands of the lawsuit on Vincent, including requests for documents, were "unnecessary, time[-]consuming[,] and expensive," which satisfied the third element. Finally, the trial court found that Vincent suffered damages as a result of the filing. At the hearing on damages, the trial court awarded no actual damages, but granted Vincent $12,000 in nominal damages and attorney fees. The *DeVaney* Court made it clear that "the plaintiff [in a malicious abuse of process action] has the burden of demonstrating actual damages for all forms of harm." *Id.* ¶ 38. Vincent established that he suffered attorney fees, which we discuss in detail in subsequent paragraphs. Attorney fees are sufficient damages to establish the final element of malicious abuse of process. *See Dawley v. La Puerta Architectural Antiques, Inc.,* 2003–NMCA–029, ¶¶ 11, 44, 133 N.M. 389, 62 P.3d 1271 (affirming the judgment of the trial court, which included an award of attorney fees as compensatory damages for a successful malicious abuse of process claim); *see also DeVaney,* 1998–NMSC–001, ¶ 36, 124 N.M. 512, 953 P.2d 277 (eliminating the requirement of special damages for the tort of malicious abuse of process in order to allow "victims of groundless suits to obtain adequate redress"). As a matter of law, we must therefore conclude that the trial court's findings support a conclusion that Edwina and Gilbert committed the tort of malicious abuse of process. *See Weststar Mortgage Corp. v. Jackson,* 2003–NMSC–002, ¶ 8, 133 N.M. 114, 61 P.3d 823 (assessing whether the evidence to support a malicious abuse of process determination was sufficient as a matter of law).

**2. Attorney Fees, Costs, and Nominal Damages**

{55} Both parties challenge the trial court's award of attorney fees for the slander of title claim. However, we have reversed the trial court's ruling on the slander of title claim, and attorney fees for that claim are therefore no longer justified. As a result, we first consider whether Vincent was entitled to a larger award of attorney fees than the trial court granted, based on the malicious abuse of process claim. Second, we determine whether the trial court's award of nominal damages and costs was proper.

{56} As we have already stated, the tort of malicious abuse of process allows for recovery of attorney fees as compensatory damages. *See Dawley,* 2003–NMCA–029, ¶¶ 11, 44, 133 N.M. 389, 62 P.3d 1271. We review the trial court's award of attorney fees for abuse of discretion. *See Bird v. State Farm Mut. Auto. Ins. Co.,* 2007–NMCA–088, ¶ 27, 142 N.M. 346, 165 P.3d 343. Vincent offered proof that he paid $19,462.88 in attorney fees. After a hearing on the matter, the trial court granted Vincent one half of this amount. Vincent contends that he was entitled to recover the full amount. Vincent and Viola were represented by the same attorneys. "[W]hen an attorney's services are rendered in pursuit of multiple objectives, some of which permit a fee and some of which do not, the trial court must apportion the fees and award only those that are compensable." *Charter Servs., Inc. v. Principal Mut. Life Ins. Co.,* 117 N.M. 82, 86, 868 P.2d 1307, 1311 (Ct.App. 1994). Though it appears from the record that Vincent's attorneys redacted the portion of their fees relating to Viola's claims, we see no abuse of discretion with the trial court's further apportionment. A trial judge who

sits through the trial has a unique insight into the value of the attorney's services and may use that insight in assessing the fee award. *See In re N.M. Indirect Purchasers Microsoft Corp. Antitrust Litig.*, 2007–NMCA–007, ¶ 12, 140 N.M. 879, 149 P.3d 976. Therefore, we uphold the award of attorney fees.

{57} Edwina and Gilbert also challenge the amount of the award that the trial court granted to Vincent for costs. Rule 1–054(D)(1) NMRA states that "costs, other than attorney fees, shall be allowed to the prevailing party unless the court otherwise directs." We review the trial court's judgment regarding costs for abuse of discretion. *See Mayeux v. Winder*, 2006–NMCA–028, ¶¶ 40–41, 139 N.M. 235, 131 P.3d 85. A court "abuses its discretion if its decision is contrary to logic and reason. Moreover, a discretionary decision that [is] premised on a misapprehension of the law can be characterized as an abuse of discretion." *Paz v. Tijerina*, 2007–NMCA–109, ¶ 8, 142 N.M. 391, 165 P.3d 1167 (alteration in original) (internal quotation marks and citations omitted). After a hearing on the issue of costs, the trial court awarded Vincent costs in the amount of $5,355.05. Specifically, Edwina and Gilbert challenge the awards for depositions, production of exhibits, and certain expert witness fees.

{58} Rule 1–054(D)(2)(e) allows for recovery of "the cost of a deposition if any part is used at trial." Rule 1–054(D)(2)(i) allows the prevailing party to recover for "reasonable expenses involved in the production of exhibits which are admitted into evidence." Edwina and Gilbert contend that all of the deposition witnesses who were identified by Vincent in his cost bill were also deposed for the benefit of Viola and that there was no distinction made at the hearing between depositions for Vincent and depositions for Viola. Edwina and Gilbert also argue that Vincent provided no breakdown of which exhibits were Vincent's and which were Viola's and that Vincent may thus not recover the amount awarded by the court. Edwina and Gilbert's arguments on these matters are speculative. The trial court heard the arguments and received evidence on these matters, the trial court was well positioned to determine whether the depositions were for the benefit of Viola or Vincent or both, and we conclude that the trial court's decision to award costs for these items was not contrary to logic and reason.

{59} Edwina and Gilbert also dispute the award of costs regarding the testimony of five expert witnesses and argue that four of those "witnesses testified concerning increased construction costs and loan fees, an issue on which [Vincent] did not prevail." The remaining expert, a handwriting specialist, did not testify, and Vincent does not claim that the specialist was deposed. Expert witness fees are authorized as costs "for any witness who qualifies as an expert and who testifies in the cause in person or by deposition." *Fernandez v. Española Pub. Sch. Dist.*, 2005–NMSC–026, ¶ 5, 138 N.M. 283, 119 P.3d 163 (internal quotation marks and citation omitted). We will not second-guess the trial court's decision regarding the four witnesses who testified. Although Vincent did not prevail on the precise issue about which the witnesses testified, the trial court heard the testimony of the witnesses and weighed the value of that testimony in its decision to award costs. Vincent may not, however, recover expert witness fees for the expert who did not testify and was not deposed. *Id.* ¶ 8 ("[E]xpert witness fees may only be recovered as costs when the witness testifies."). Accordingly, we reverse the part of the trial court's order that grants Vincent costs for the handwriting expert.

{60} Edwina and Gilbert also argue that attorney fees operate as compensatory damages in the context of Vincent's claim and that the award of attorney fees therefore precludes the trial court from also awarding nominal damages. We agree. Nominal damages are "a trivial sum of money awarded to a litigant who has established a cause of action but has not established that he is entitled to compensatory damages." *Sanchez v. Clayton*, 117 N.M. 761, 767, 877 P.2d 567, 573 (1994) (emphasis omitted) (internal quotation marks and citation omitted). Vincent proved that he suffered compensatory damages in the form of attorney fees. *See Dawley*, 2003–NMCA–029, ¶¶ 11, 44, 133

N.M. 389, 62 P.3d 1271. As a result, he is not also entitled to recover nominal damages.

### 3. Post-judgment Interest

{61} Vincent next argues that he was entitled to post-judgment interest at a rate of fifteen percent, instead of the eight and three-fourths percent that the trial court awarded. NMSA 1978, § 56–8–4 (2004), states the following:

> A. Interest shall be allowed on judgments and decrees for the payment of money from entry and shall be calculated at the rate of eight and three-fourths percent per year, unless
>
> . . . .
>
> (2) the judgment is based on tortious conduct, bad faith or intentional or willful acts, in which case interest shall be computed at the rate of fifteen percent.

"[A]n award of post-judgment interest under Section 56–8–4(A) is mandatory." *Nava v. City of Santa Fe*, 2004–NMSC–039, ¶ 22, 136 N.M. 647, 103 P.3d 571; *see also Pub. Serv. Co. of N.M. v. Diamond D Constr. Co.*, 2001–NMCA–082, ¶ 54, 131 N.M. 100, 33 P.3d 651. "An award of post-judgment interest serves three purposes: compensating the plaintiff for being deprived of compensation from the time of the judgment until payment . . . by the defendant, discouraging unsuccessful defendants from pursuing frivolous appeals, and minimizing court supervision of the execution of judgments." *Bird*, 2007–NMCA–088, ¶ 42, 142 N.M. 346, 165 P.3d 343 (internal quotation marks and citation omitted). This Court has also noted that "[w]hen a judgment is based on tortious conduct, bad faith, or a finding that the defendant acted intentionally or willfully, a court must award interest at the higher rate of [fifteen] percent." *Diamond D Constr. Co.*, 2001–NMCA–082, ¶ 55, 131 N.M. 100, 33 P.3d 651. Here, the trial court based its ruling, which granted post-judgment interest at eight and three-fourths percent, on Vincent's slander of title claim, which we have reversed. We have also, however, reversed the trial court's denial of Vincent's malicious abuse of process claim, which is based on tortious conduct. As a result, the proper post-judgment interest rate for Vincent's successful malicious

abuse of process claim is fifteen percent. *See id.*

### 4. Actual Damages

{62} Vincent's final claim is that the trial court improperly failed to award actual damages as compensation for loss of use of the property. We review the determination of damages by the fact-finder for substantial evidence. *Baxter v. Gannaway*, 113 N.M. 45, 48, 822 P.2d 1128, 1131 (Ct.App. 1991). Vincent argues that he provided evidence to establish that he was entitled to compensation for lost use of the property. Specifically, Vincent contends that the suit and the filing of lis pendens prevented him from being able to get a loan to build an addition to the house on his property and that the costs of building, interest rates, and city fees have increased significantly in the ensuing years.

{63} The trial court made the following findings:

> 12. Vincent Varela's construction plans were dependent on Viola Varela's adjoining property. The [c]ourt set aside Viola Varela's deed to this adjoining property in its [c]orrected [f]inal [j]udgment.
>
> 13. After this lawsuit was filed, Vincent Varela knew that title to Viola Varela's lot next door was being challenged. He has never asked [the] architect . . . to redo the drawings and remove the encroachments onto Viola Varela's lot, even after the deed to Viola Varela was set aside[.]

Our review of the record confirms that substantial evidence supports these findings and the necessary conclusion that if Vincent's building plans were dependent on Viola's success in the ligation surrounding the deeds, Vincent suffered no actual damages that were the result of being a named defendant. He could not have commenced on the project until after the litigation regarding the deeds was resolved. We conclude that the substantial evidence supported the trial court's refusal to award actual damages to Vincent.

### III. CONCLUSION

{64} We reverse the trial court's conclusion that the will was the product of undue influence exerted by Viola. We further re-

verse the trial court's grant of Vincent's slander of title claim and the trial court's denial of Vincent's malicious abuse of process claim. We affirm the trial court's granting of attorney fees and costs, except the cost of the handwriting expert, who did not testify and was not deposed. Because Vincent received actual damages for malicious abuse of process in the form of attorney fees, we reverse the trial court's grant of nominal damages. Post-judgment interest is to be calculated at the rate of fifteen percent on Vincent's malicious abuse of process damages. We affirm the trial court's refusal to grant actual damages. We remand for entry of judgment consistent with this opinion.

{65} **IT IS SO ORDERED.**

WE CONCUR: LYNN PICKARD and MICHAEL D. BUSTAMANTE, Judges.