# IN THE SUPREME COURT OF THE STATE OF NEW MEXICO

Opinion Number: 2009-NMSC-041

Filing Date: July 20, 2009

Docket No. 31,234

IN THE MATTER OF THE ESTATE OF
GREGORIA C DE BACA, Deceased,

EDWINA CHAPMAN and GILBERT C DE BACA,

      Plaintiffs-Petitioners,

v.

VIOLA A. VARELA and VINCENT VARELA,

      Defendants-Respondents.

ORIGINAL PROCEEDING ON CERTIORARI
Carol J. Vigil and Daniel A. Sanchez, District Court Judges

Law Office of Ronald Boyd
J. Ronald Boyd
Santa Fe, NM

for Petitioners

Simons & Slattery, L.L.P.
Thomas A. Simons, IV
Faith Kalman Reyes
Santa Fe, NM

Canepa & Vidal, P.A.
Timothy J. Vidal
Santa Fe, NM

for Respondents

Keleher & McLeod, P.A.
Gregory W. MacKenzie
Albuquerque, NM

1

Roepke Law Firm, L.L.C.
Karl H. Roepke
Albuquerque, NM

for Amicus Curiae
N.M. Trial Lawyers Association

**OPINION**

**CHÁVEZ, Chief Justice.**

**{1}** When Gregoria C de Baca died on May 11, 2004, she was survived by nine children: Rosina Villa, Rudy C de Baca, Viola Varela, Simon C de Baca, Tom C de Baca, Daniel C de Baca, Gilbert C de Baca, Edwina Chapman, and Donna C de Baca. Gregoria's will, dated August 28, 2002, left one dollar to each of her children except Viola, who the will appointed as personal representative and to whom the will conveyed the remainder of Gregoria's estate via its residuary clause. Viola already had received much of Gregoria's real property via five inter vivos warranty deeds that had been signed and recorded about three years before Gregoria's death and about one year before the will was executed. Edwina and Gilbert, subsequently joined by Rudy, Daniel, Rosina, and Donna, brought actions in district court to set aside the will and deeds as the products of Viola's undue influence. After a trial, the district court voided the will and the deeds. The Court of Appeals concluded that there was insufficient evidence to support the district court's finding of undue influence regarding the will, but did not reach the issue of the deeds. *Chapman v. Varela* (*In re Estate of C de Baca*), 2008-NMCA-108, ¶¶ 11, 47, 144 N.M. 709, 191 P.3d 567.

**{2}** We reverse the Court of Appeals and hold that there was sufficient evidence to support the district court's findings of a confidential relationship between Gregoria and Viola and suspicious circumstances surrounding the execution of her will. Accordingly, under our rules governing civil presumptions, we hold that sufficient evidence existed for the district court's ultimate conclusion that the will was void as the product of Viola's undue influence. Finally, because the Court of Appeals did not decide the validity of the deeds, and because this issue was not specifically briefed to the Supreme Court, we remand to the Court of Appeals for its determination of this issue.

## I.    BACKGROUND

**{3}** Gregoria C de Baca died on May 11, 2004, at the age of 84. Edwina and Gilbert, claiming that Gregoria died intestate, submitted an application in district court for informal appointment as personal representatives. They were subsequently named personal representatives of Gregoria's estate. In a separate action that was later consolidated with the probate proceedings in district court, Edwina and Gilbert claimed that five inter vivos warranty deeds of Gregoria's real property to Viola were procured by forgery,

2

misrepresentation, or undue influence.[1] Viola subsequently petitioned the district court to admit Gregoria's will into probate, and in accordance with the will, to remove Edwina and Gilbert as personal representatives and appoint her in their place. The will provided one dollar to each of Gregoria's children except for Viola and purported to detail Gregoria's grievances with several of them. In contrast, the will praised Viola, noted that Gregoria's bank accounts and real property had already been conveyed to her, and devised the residue of Gregoria's estate to her. Viola was appointed personal representative and made various counterclaims that are not relevant to this appeal. Edwina and Gilbert, joined by Rudy, Daniel, Rosina, and Donna (collectively "Siblings"), petitioned the district court to set aside the will as a product of Viola's undue influence. After a bench trial, the district court removed Viola as personal representative and set aside the deeds and the will, concluding that "[b]y clear and convincing evidence, [the deeds] and [the will] are the result of undue influence by Viola Varela."

{4}     Viola sought review in the Court of Appeals, which reversed the district court, holding that there was insufficient evidence that the will was the product of undue influence. *Chapman*, 2008-NMCA-108, ¶ 47. In reaching its conclusion, the Court of Appeals held that "[t]he evidence regarding old age, unnatural disposition, domination, and secrecy did not establish that Viola substituted her own intent for Gregoria's." *Id*. Given this shortfall and the Court's conclusion that Viola did not participate in procuring the will, but did provide "consideration in the form of love, friendship, and help with daily living[,]" *id.*, the Court of Appeals concluded that the district court could not have found clear and convincing evidence of undue influence. *Id*. The Court of Appeals averred that it did not need to reach the question of whether the deeds were the product of undue influence, *id*. ¶ 11, presumably because even if they were invalid, Gregoria's real property would pass to Viola via the will's residuary clause. Siblings seek review on a number of issues that, taken together, amount to a challenge of the Court of Appeals' holding on the sufficiency of the evidence of undue influence. The New Mexico Trial Lawyers Association joins them as Amicus Curiae in criticizing the Court of Appeals' opinion.

## II.     DISCUSSION

## A.     STANDARD OF REVIEW

{5}     To find sufficient evidence to support the district court's invalidation of Gregoria's will because of undue influence, we must be able to conclude that a reasonable fact finder could have found clear and convincing evidence of undue influence. *Gersbach v. Warren* (*In re Estate of Gersbach*), 1998-NMSC-013, ¶ 31, 125 N.M. 269, 960 P.2d 811. Clear and convincing evidence is evidence that would "instantly tilt[] the scales in the affirmative when

---

[1]Siblings also sought to set aside a deed of real property from Gregoria to Viola's son, Vincent, but neither this claim nor Vincent's various counterclaims are relevant to this appeal.

3

weighed against the evidence in opposition . . . ." *In re Locatelli*, 2007-NMSC-029, ¶ 7, 141 N.M. 755, 161 P.3d 252 (per curiam) (internal quotation marks and citation omitted). In determining sufficiency, we keep in mind that "[t]he duty to weigh the credibility of witnesses and to resolve conflicts in the evidence lies with the trial court, not the appellate court. We consider the evidence in the light most favorable to the prevailing party and disregard any inferences and evidence to the contrary." *Doughty v. Morris*, 117 N.M. 284, 287, 871 P.2d 380, 383 (Ct. App. 1994) (citation omitted). However, we give no deference to the district court's conclusions of law. *See Primetime Hospitality, Inc. v. City of Albuquerque,* 2009-NMSC-011, ¶ 10, 146 N.M. 1, 206 P.3d 112 ("We review these questions of law de novo, without deference to the district court's legal conclusions."). We are mindful of Viola's complaint that the district court's findings are "insufficient" and "are conclusions listed [as] factual findings." Although we disagree that the district court's findings are so insufficient that they necessitate a remand, we recognize that some of the district court's findings are conclusions of law, and we do not afford such conclusions any deference in our review.

## B.   DEFINING UNDUE INFLUENCE

**{6}**     The first dispute between the parties concerns *exactly what it is* that the district court must have been able to find by clear and convincing evidence to set aside Gregoria's will because of undue influence. However, as a preliminary matter, the parties do not disagree over the most general outlines of this doctrine. Undue influence "means influence, improperly exerted, which acts to the injury of the person swayed by it or to the injury of those persons whom [he or] she would have benefited." *Brown v. Cobb*, 53 N.M. 169, 172, 204 P.2d 264, 266 (1949). We have hesitated to provide precise elements for undue influence because "any attempt to define it may well suggest a clear path of evasion." *Id*. The contestant of a will (in this case, Siblings) bears the burden of persuading the finder of fact that undue influence occurred. NMSA 1978, § 45-3-407 (1975).

**{7}**     Many years ago, we observed that the fundamental problem of proving undue influence was that:

> In the nature of things it would be a rare case where the details of conversation or conduct could be shown indicating undue persuasion and influence. Such arts would be exercised only in the absence of witnesses, or, at most, in the presence of those whose interest and inclination would impel to their denial.

*Cardenas v. Ortiz*, 29 N.M. 633, 640, 226 P. 418, 421 (1924) (internal quotation marks and citation omitted). For this reason, New Mexico law has traditionally allowed the contestant of a will to meet certain procedural hurdles, detailed later in this opinion, by raising a presumption of undue influence. Moreover, "because of the difficulty in obtaining direct proof in cases where undue influence is alleged, proof sufficient to raise the presumption is inferred from the circumstances." *Montoya v. Torres*, 113 N.M. 105, 110, 823 P.2d 905, 910

4

(1991). "The presumption arises if a confidential or fiduciary relation with a donor is shown together with suspicious circumstances." *Id*. Such circumstances include:

> (1) old age and weakened physical or mental condition of testator; (2) lack of consideration for the bequest; (3) unnatural or unjust disposition of the property; (4) participation of beneficiary in procuring the gift; (5) domination or control over the donor by a beneficiary; and (6) secrecy, concealment, or failure to disclose the gift by a beneficiary.[2]

*Id*. "This is not an exhaustive list, nor is it a list of circumstances that are always suspicious. Furthermore, the presence of any of these circumstances is not in itself dispositive." *Gersbach,* 1998-NMSC-013, ¶ 8.

**{8}**     The parties disagree over the effect the presumption should have on our review for substantial evidence. Viola urges us to accept the reasoning of the Court of Appeals. That Court noted that "[i]n order to uphold the . . . judgment [of undue influence], we would need to conclude that, viewing the evidence in the light most favorable to [the contestant], a reasonable fact finder could find clear and convincing evidence that the testator made a gift he would not have made absent improper influence." *Chapman*, 2008-NMCA-108, ¶ 46 (modifications in original) (quoting *Gersbach*, 1998-NMSC-013, ¶ 31). From this premise, the Court of Appeals  reasoned that it must "consider the existence of suspicious circumstances *not as ends in themselves but as clues* in discovering the testator's intent." *Id*. ¶ 17 (emphasis added). Surveying the evidence in light of this standard, the Court noted that "[a]lthough Siblings presented a great deal of evidence that appears to satisfy the elements [sic] of undue influence, closer examination reveals that very little of the testimony and evidence is relevant to the determination of Gregoria's intent." *Id*. ¶ 47. The Court of Appeals explained that it took this approach out of concern that making proof of undue influence too easy could undermine testamentary freedom. *Id*. ¶ 13.

**{9}**     Siblings and Amicus, on the other hand, argue that by requiring proof going to the ultimate issue of whether Gregoria's intent was subverted through undue influence, the Court of Appeals "would require contestants to prove facts that are often unknowable" and thereby "denie[d] the contestants their well-established right to a presumption . . . ." Siblings and Amicus claim that "New Mexico undue influence law puts upon the contestant only the burden of showing a confidential relationship and circumstances which over the decades have proven to be reliable indicia of an abuse of a confidential relationship." We believe that this position is essentially correct.

**{10}**     To explain our conclusion, we must briefly expound on the effect of presumptions

---

[2]In our analysis of these factors later in the opinion, we re-order the factors slightly by placing lack of consideration last. We take this action because this factor is irrelevant to the case at bar and because the Court of Appeals re-ordered the factors in the same way.

5

in civil cases in New Mexico. Rule 11-301 NMRA provides that:

> In all civil actions and proceedings not otherwise provided for by statute or by these rules, a presumption imposes on the party against whom it is directed the burden of going forward with evidence to rebut or meet the presumption, but does not shift to such party the burden of proof in the sense of the risk of nonpersuasion, which remains throughout the trial upon the party on whom it was originally cast.

**{11}** Rule 11-301 operates in undue influence cases as follows. In a jury trial, once a presumption of undue influence is raised, the contestant's burden of going forward with the evidence is satisfied and he or she is not susceptible to a motion for judgment as a matter of law. *Mortgage Inv. Co. v. Griego*, 108 N.M. 240, 244, 771 P.2d 173, 177 (1989) ("Presumptions governed by the [rule] operate to avoid a directed verdict . . . ."); *Martinez v. Cantu* (*In re Estate of Gonzales*), 108 N.M. 583, 584, 775 P.2d 1300, 1301 (Ct. App. 1988) ("[A] party may rely on a presumption to establish his or her prima facie case."). In addition, once evidence sufficient to raise the presumption has been introduced, a "burden of going forward with evidence to rebut or meet the presumption" is imposed upon the proponent of the will. Rule 11-301. Our case law is not consistent regarding the effect of failing to "rebut or meet" a presumption, but we need not resolve this issue as it is not before us. *Compare Griego*, 108 N.M. at 243-44, 771 P.2d at 176-77 ("If the adverse party offers no evidence contradicting the presumed fact, the trial court will instruct the jury that if it finds the basic facts, it *may* presume the existence of the presumed fact."), *with Gonzales*, 108 N.M. at 585, 775 P.2d at 1302 ("If the proponent does not meet this burden, the contestant's evidence might require a finding of undue influence."). In a non-jury trial such as this one, the impact of a presumption is slightly different. We have observed that due to the use of involuntary dismissal rather than directed verdicts in bench trials, "as a practical matter, presumptions in a civil nonjury trial under Rule 301 are little more than rhetorical devices; one can argue them to a judge but they have no mandatory effect upon his decision[,]" which is reached by weighing the evidence. *Griego*, 108 N.M. at 244, 771 P.2d at 177 (emphasis removed) (citation omitted).

**{12}** More importantly for the purposes of our sufficiency of the evidence review on appeal, under Rule 11-301 a presumption once raised in both jury and non-jury trials continues to have evidentiary force, regardless of the contradictory evidence presented by the party against whom it is employed. Thus, although the raising of the presumption does not mandate any final result at trial, if the fact finder concludes that the party raising the presumption has prevailed and we find sufficient evidence to support the raising of the presumption, we will not set aside the fact finder's conclusion on appeal. This is because Rule 11-301 "eliminated the 'bursting bubble' theory of presumptions, and a presumption now retains evidentiary effect throughout the trial, so as to permit the fact finder to draw an inference of the presumed fact from proof of the basic or predicate fact." *Roberts Oil Co. v. Transamerica Ins. Co.*, 113 N.M. 745, 756, 833 P.2d 222, 233 (1992). Under the defunct bursting bubble theory, once a presumption was rebutted, the basic facts that raised it

6

remained, but they were given no special evidentiary value and might or might not be enough to reach the fact finder. In contrast, without a bursting bubble theory, the presumption always remains and the basic facts can justify a finding of the presumed fact, even if, in the absence of the presumption, the basic facts might not justify such a finding. *See* 2 Kenneth S. Broun, *McCormick on Evidence* § 344, at 508-10 (6th ed. 2006). In other words, "the inference may continue to operate in an evidentiary sense even after introduction of evidence tending to establish the contrary, and may sufficiently influence the trier of facts to conclude that the presumed fact does exist."[3] *State Farm Mut. Auto. Ins. Co. v. Duran*, 93 N.M. 489, 492, 601 P.2d 722, 725 (Ct. App. 1979). The justification for this change was that denying any evidentiary effect to a rebutted presumption gave presumptions "too slight and evanescent an effect[,]" *Trujillo v. Chavez*, 93 N.M. 626, 629, 603 P.2d 736, 739 (Ct. App. 1979) (internal quotation marks and citation omitted), and ignored the fact that many presumptions are created for policy reasons that "may persist despite the existence of proof rebutting the presumed fact." 2 Broun, *supra*, § 344, at 509.

**{13}** It is precisely because of the evidentiary effects of presumptions that our law employs them in undue influence cases, where, as we noted above, direct proof is notoriously elusive. The mechanism of a presumption allows the will contestant to get the issue of undue influence before the fact finder by offering only proof of a confidential relationship and suspicious circumstances.

**{14}** Of course, even if a party successfully raises a presumption that could be used by the fact finder to justify a finding of the ultimate fact of undue influence, the risk of nonpersuasion never shifts from the party on whom it was originally placed: the will contestant. Rule 11-301; § 45-3-407. The ultimate question before the trier of fact is whether the will contestant has proven that "the testator made a gift he would not have made absent improper influence." *Gersbach*, 1998-NMSC-013, ¶ 31; *see Barber v. Pound* (*In re Estate of Strozzi*), 120 N.M. 541, 542-43, 903 P.2d 852, 853-54 (Ct. App. 1995) (approving a jury instruction requiring the jury to find either (1) that a confidential relationship existed and that the will proponent "used that position to unfairly and improperly influence [the decedent] to his injury, or to the injury of those persons he would have benefitted in the absence of the influence[;]" or (2) that the will proponent "unfairly and improperly influenced [the decedent] as to prevent him from exercising a free and understanding judgment when he executed his will."). However, the fact finder is permitted to draw its conclusion based entirely on the basic facts and the presumption, if it so chooses. *See Strozzi*, 120 N.M. at 544-45, 903 P.2d at 855-56 (also noting an instruction on the

---

[3]We note that the effect of presumptions in civil cases is thus markedly different than in criminal cases, where a presumption can have no inherent evidentiary effect. *See State v. Trossman*, 2009-NMSC-__, ¶ 18, __ N.M. __, __ P.3d __ (No. 31,010, June 22, 2009) (noting that a presumption in a criminal case may not "undermine the factfinder's responsibility at trial, based on evidence adduced by the State, to find the ultimate facts beyond a reasonable doubt" (internal quotation marks and citation omitted)).

7

presumption, and noting that "[r]espondents do not contest that the verdict must be affirmed if Petitioners established the existence of a confidential relationship and certain suspicious circumstances."). We note that some of our cases may have inadvertently obscured the distinction between the evidence required to raise the presumption and the ultimate question of undue influence. *See*, *e.g.*, *Gersbach*, 1998-NMSC-013, ¶¶ 28-29 (stating that "[t]o give rise to a presumption of undue influence, and the need for the beneficiary to rebut the presumption, the evidence must justify an inference of misconduct which produced a desired or foreseeable result[;]" and that "[u]nless the evidence presented by [contestant] justified an inference that the gift was the result of improperly exerted influence, such questions do not require an answer . . ."). Although we do not believe that the outcomes of any such cases are unsound, these misstatements do not represent our law, because they seem to require that the evidence of the basic facts must give rise to a natural inference of specific instances of misconduct. To require the evidence of the basic facts to give rise to a natural inference of specific instances of misconduct would render the presumption meaningless.

**{15}** For this reason, we disagree with the Court of Appeals that its role was to "consider the existence of suspicious circumstances not as ends in themselves but as clues in discovering the testator's intent[,]" *Chapman*, 2008-NMCA-108, ¶ 17, and that the evidence of undue influence "must do more than raise a suspicion." *Id*. ¶ 13 (internal quotation marks and citation omitted). On the contrary, because the fact finder could have relied upon the presumption without any direct evidence "relevant to the determination of Gregoria's intent[,]" *id*. ¶ 47, we cannot demand anything more on review. As this Court explained in *Hummer v. Betenbough*, 75 N.M. 274, 281, 404 P.2d 110, 115 (1965), under the then-existing bursting bubble theory, "[t]he contestant need not offer *at the outset* any evidence that undue influence was exerted." (Emphasis added) (internal quotation marks and citation omitted). Now that the bursting bubble theory has been abandoned, the contestant is *never required* to offer direct evidence of undue influence; the presumption, if supported by evidence, will of its own force take him or her to the finder of fact, even in the face of contradictory evidence.

**{16}** We must also emphasize that we do not believe that these standards pose a risk to testamentary freedom. While a presumption will take the contestant to the fact finder, the fact finder must still determine whether the contestant has made his or her ultimate case for undue influence by clear and convincing evidence. In so deciding, the fact finder may credit *or ignore* the presumption. As a result, a canny contestant may not feel comfortable resting on the bare quantum of evidence sufficient to raise the presumption of undue influence. We trust that juries and judges acting as finders of fact will make the reasonable choice if asked to weigh a contestant's naked presumption against the well-supported explanations of a will proponent. Our system of presumptions simply assures that it is the finder of fact, not the judge as arbiter of law, that makes this determination.

**{17}** In sum, our review for sufficiency of the evidence will be satisfied if there was enough evidence to allow the finder of fact to find clearly and convincingly that Viola and Gregoria had a confidential relationship and that suspicious circumstances existed. We

8

disagree with the Court of Appeals' statements that the factors giving rise to the presumption are *for the appellate court* merely "clues in discovering the testator's intent[,]" *Chapman*, 2008-NMCA-108, ¶ 17, and that the evidence of undue influence "must do more than raise a suspicion." *Id.* at ¶ 13 (internal quotation marks and citation omitted). The role of the appellate court reviewing sufficiency of the evidence to support a finding of undue influence is simply to determine whether the presumption of undue influence could have been raised.

## C. THERE WAS SUFFICIENT EVIDENCE TO SUPPORT THE DISTRICT COURT'S FINDING OF UNDUE INFLUENCE

**{18}** Our review for substantial evidence requires us to consider whether the evidence as a whole was sufficient to prove the existence of a confidential relationship and suspicious circumstances. *See Strozzi*, 120 N.M. at 544-45, 903 P.2d at 855-56. We first review the evidence cited by the district court as supporting its findings of a confidential relationship and each of the individual suspicious circumstances to determine whether it was relevant. Although the Court of Appeals was incorrect when it concluded that much of this evidence was not relevant to the issue of undue influence because it was not "relevant to the determination of Gregoria's intent[,]" *Chapman*, 2008-NMCA-108, ¶ 47, our cases do require that the evidence depended upon be relevant to the presumption factors. *See*, *e.g.*, *Gonzales*, 108 N.M. at 585-86, 775 P.2d at 1302-03 ("No New Mexico case has based a presumption of undue influence on the fact that the testator was elderly without evidence that the testator's age had affected his or her mental ability."). In this regard, Viola urges us to strictly limit the evidence admissible to prove undue influence to facts closely connected in time and subject matter to the execution of the will, but Siblings and Amicus suggest that to do so would needlessly overlook evidence relevant to determine whether a confidential relationship and suspicious circumstances existed. We conclude that in many instances, the Court of Appeals' focus on proof going directly to the ultimate fact of undue influence led it to disqualify evidence that, while certainly not determinative in and of itself, could properly have contributed to the district court's conclusions. *See id.* at 586, 775 P.2d at 1303 ("None of the individual circumstances surrounding the execution of decedent's will is sufficient to raise a presumption of undue influence. That leaves the question of whether a presumption of undue influence arises when the trial court's findings are considered as a whole.").

### 1. CONFIDENTIAL OR FIDUCIARY RELATIONSHIP

**{19}** Citing the evidence that Gregoria had depended on Viola for transportation, meals, and housekeeping, had given Viola a power of attorney and placed Viola's name on her bank accounts, the district court concluded that a confidential or fiduciary relationship existed between the two. We agree with the Court of Appeals that this was supported by sufficient evidence. *Chapman*, 2008-NMCA-108, ¶ 16. In *Gersbach*, we recognized that our previous test for confidential relationships was potentially too broad because it only required a showing that "one person place[d] trust and confidence in the integrity and fidelity of another." 1998-NMSC-013, ¶ 11 (internal quotation marks and citation omitted). However,

9

we found a confidential relationship where:

> The record indicates [decedent] and [proponent] were close friends. The two often spent time together alone and talked on the phone frequently, conversations to which [contestant] was not a party. The record also indicates that [decedent] trusted [proponent]. [Proponent] was permitted to pay a minimal rent on the farm . . . . The trial court found that [decedent] "had disclosed to [proponent] the location of substantial amounts of cash" . . . and that [decedent] "loaned money to [proponent] without setting any particular terms for the repayment of those debts." These facts support the district court's finding that a confidential relationship existed.

*Id.* ¶ 12 (citation omitted). The relationship between Viola and Gregoria certainly rose to this level. Viola admitted that she had a close relationship with Gregoria, seeing her daily, bathing her, buying her groceries, cleaning her house, accompanying her to doctor's appointments, and paying her bills. Viola also admitted that she had a joint checking account with Gregoria and had received a durable power of attorney from her. Particularly after Gregoria's hearing declined following a stroke, testimony indicated that Gregoria used Viola as an intermediary to communicate with others and may simply have allowed Viola to speak for her. Finally, Gregoria allowed Viola to participate in the drafting and execution of her will and the deeds. This level of trust and dependence satisfies even the most stringent definitions of a confidential or fiduciary relationship.

## 2.  SUSPICIOUS CIRCUMSTANCES

### a.  Old Age and Weakened Physical or Mental Condition

**{20}**  The district court considered Gregoria's ill health and resultant dependence on her family as evidence contributing to its finding of suspicious circumstances. For instance, it found that "[i]n [her] last few years Gregoria C de [B]aca also suffered from age related and stroke related loss of cognitive functioning and memory loss." The Court of Appeals held that this evidence should not have contributed to a finding of undue influence, explaining that evidence of Gregoria's declining physical and mental condition did not demonstrate the susceptibility to influence required under our case law. *See Chapman*, 2008-NMCA-108, ¶ 18.

**{21}**  We disagree. It is true that "[n]o New Mexico case has based a presumption of undue influence on the fact that the testator was elderly without evidence that the testator's age had affected his or her mental ability." *Gonzales*, 108 N.M. at 585-86, 775 P.2d at 1302-03. Evidence of ailments with no effect on cognition are simply irrelevant to determine whether the decedent might have been unduly influenced. For this reason, in *Lucero v. Lucero* (*In re Estate of Lucero*), 118 N.M. 636, 642, 884 P.2d 527, 533 (Ct. App. 1994), *superceded by statute on other grounds as recognized in Garcia v. Taylor* (*In re Estate of Frietze*), 1998-NMCA-145, ¶ 17, 126 N.M. 16, 966 P.2d 183, the Court of Appeals upheld

10

a directed verdict against will contestants, despite posthumous examinations of testator's medical records generally suggesting senile dementia and cortical atrophy, because undisputed evidence suggested that the decedent was lucid at the time of the execution of the will. Similarly, in *Gonzales*, 108 N.M. at 586, 775 P.2d at 1303, the Court of Appeals found that the contestants had not raised a suspicion of undue influence when they showed the decedent to be old and sick, but the only evidence regarding her mental state showed her to be alert. Further, when mental weakness is the *only* suspicious circumstance in a case, even more definitive evidence of susceptibility may be required. *See In re Estate of Keeney*, 121 N.M. 58, 62, 908 P.2d 751, 755 (Ct. App. 1995) (holding that evidence of ill health and emotional instability would not, without more, have supported a presumption of undue influence, but that when combined with the testimony of a psychologist who stated that the decedent's health problems would lead to susceptibility to influence, this evidence, with little else in the way of suspicious circumstances, was sufficient to raise a genuine issue of fact regarding the existence of undue influence).

**{22}** Although Siblings did not present the sort of overwhelming evidence of susceptibility that might justify raising the presumption in and of itself, the evidence they did produce of Gregoria's susceptibility was still relevant. *See Chapman*, 2008-NMCA-108, ¶ 18. Because it concluded to the contrary, the Court of Appeals may have overlooked the following evidence: Gregoria suffered a stroke that had detrimental effects on her cognition, memory, and hearing; she sustained a series of physical maladies including multiple hip replacements, bone fractures, and heart problems; and she took a number of medications with possible cognitive side effects. We agree that without evidence of additional suspicious circumstances, this might not be enough, even assuming the presence of a confidential relationship, to raise the presumption of undue influence. *See Keeney*, 121 N.M. at 62, 908 P.2d at 755. Also, we concede that it might make a stronger case to secure expert testimony of susceptibility even if other suspicious circumstances are present. *See, e.g.*, *Montoya*, 113 N.M. at 109, 823 P.2d at 909. However, because this evidence goes directly to Gregoria's mental clarity at the time of the will's execution, we see no reason to categorically exclude it from the district court's ultimate consideration of the evidence as a whole, even if it only marginally contributes to that court's conclusion. *See*, *e.g.*, *Peralta v. Peralta*, 2006-NMCA-033, ¶ 22, 139 N.M. 231, 131 P.3d 81 (considering evidence of the decedent's "advanced age and physical frailty" as contributing to the presumption of undue influence when considered with other suspicious circumstances as a whole). Thus, we disagree with the Court of Appeals that "there was insufficient evidence to justify an inference that either Gregoria's age or her health is a suspicious circumstance." *Chapman*, 2008-NMCA-108, ¶ 18.

### b. Unnatural or Unjust Disposition

**{23}** The district court found that Gregoria's will was an "[unjust] and unnatural disposition" because "[t]he conveyances and the Will were at variance with the previous declarations and known affections of Gregoria C de Baca." The Court of Appeals disagreed. It noted first that because Viola is Gregoria's daughter, "[t]he devise in the present case does

11

not fit easily into the traditional definition of an unnatural gift because although Viola is a natural object of Gregoria's bounty, so were the other eight children . . . ." *Chapman*, 2008-NMCA-108, ¶ 19. The Court explained that the mere fact that the will did not distribute Gregoria's property as would the intestacy statutes could not contribute to a finding of undue influence; instead, the Court of Appeals required "evidence that the division of property did not reflect the intent of the testator . . . ." *Id*. The Court gave some credence to the statements of Siblings and other witnesses that Gregoria had expressed intentions and affections contrary to the will, *see id*. ¶¶ 22, 24-25, but found more convincing the evidence "that when Gregoria wanted to make a gift, she made it." *Id*. ¶ 23. It also noted that "[t]here is no evidence that Gregoria intended to divide her property equally among her children . . . ." *Id*. ¶ 26. The Court concluded that the evidence "does not provide insight into Gregoria's intentions" and could not contribute to a finding of suspicious circumstances. *Id*.

**{24}** Although we agree with the Court of Appeals that some of the evidence ostensibly contributing to the district court's ruling that the will was an unnatural or unjust disposition was not relevant, we reach this conclusion partly in a different manner. To begin, however, we concur with the Court of Appeals that Gregoria's will does not fit the traditional definition of an unnatural disposition. In *Gersbach*, we explained that "[a] 'natural disposition' has been defined as one 'which provides for a testator's heirs at law. As one court succinctly put it: '[T]he natural object of a will maker's bounty is one related to him/her by consanguinity.'" 1998-NMSC-013, ¶ 24 (citation omitted). Viola is one of Gregoria's children, and as such, Gregoria's testamentary gift to her was not unnatural, even if Gregoria's other children were excluded. If any transfer that diverged from the intestacy statute could be considered unnatural, testamentary freedom would be threatened.

**{25}** However, our cases have also defined unnatural or unjust dispositions to include transfers of property at odds with a testator's previously expressed intentions and affections. For instance, in *Doughty*, 117 N.M. at 289-90, 871 P.2d at 385-86, the Court of Appeals upheld a trial court's finding of an unnatural or unjust disposition when one child had been effectively disinherited via inter vivos transfers to another child, but the evidence, including the decedent's will, indicated "that [decedent] enjoyed a close relationship with both her children and she commented that she wanted [both children] to share her estate equally." Similarly, in *Montoya*, 113 N.M. at 111-12, 823 P.2d at 911-12, we upheld a trial court's finding of undue influence based in part on a suspicious unnatural or unjust disposition when "the gift to [decedent's step-grandson] may have been inconsistent with [decedent]'s previously expressed intention" to give the property to her son.

**{26}** In this case, the bulk of Siblings' testimony relating to this factor concerned Gregoria's real property. Five witnesses testified that Gregoria had planned to give her house to Gilbert, who received just one dollar in the will. The only other evidence potentially going to the issue of unjust disposition concerned the falsehood of some of the assertions in the will. For instance, the will stated that Rosina had not seen Gregoria for twenty years, had stolen and never paid back $18,000, and had been unappreciative and rude. Rosina testified that she had seen Gregoria over the last twenty years, had never taken $18,000, and had not

behaved as the will claimed she did. The will stated that Gilbert had refused to pay the bills while living in Gregoria's house, had made unpleasant remarks or been moody, and had never repaid loans. Gilbert testified that he had attempted to pay the bills, had a close relationship with his mother and had not made such remarks, and had provided some money to Gregoria, but had been assured by her that he did not need to repay the full amount of the loans.

**{27}** We disagree with the Court of Appeals' reasons for rejecting this evidence. First, the Court stated that because Gregoria gave gifts when she was so inclined, the testimony about the real property was not relevant to undue influence. Our standard of review precludes us from re-weighing the evidence on appeal. *See Doughty*, 117 N.M. at 287, 871 P.2d at 383. Second, we can find no support for the Court's requirement of evidence that the testator intended to divide her property equally for a contrary disposition to be unjust. If the will had been intended to dispose of property contrary to Gregoria's previously stated intentions, we see no reason that such evidence should be categorically excluded from contributing to a suspicion of undue influence.[4]

**{28}** Nevertheless, we still hold that the evidence concerning the real property was not relevant to whether the will was an unjust disposition. We reach this conclusion because there is no evidence that the will was intended to dispose of any of the real property that was the focus of Siblings' evidence. On the contrary, the warranty deeds to Viola were the instruments that were intended to dispose of Gregoria's real property, including the house that Siblings claimed was to be given to Gilbert. Although Siblings' actions to void the deeds have raised the potential that the real property could in fact pass via the residuary clause of the will, no evidence suggests that this was part of Viola's design. To the contrary, the residuary clause was added to the will at the suggestion of an attorney more than a year after the execution of the deeds. Although, as we discuss below, Viola participated heavily in drafting earlier versions of the will around the time of the execution of the deeds, these earlier versions included no residuary clause and specifically stated that the real property had

---

[4]We note that *Gersbach* may have suggested that the bar for proving unnatural or unjust dispositions in New Mexico is higher than this. 1998-NMSC-013, ¶ 28. However, the authority relied upon in this portion of *Gersbach* is Margaret B. Alcock, Comment, *Estates and Trusts*, 13 N.M. L. Rev. 395 (1983), and it appears to contain a crucial error. Alcock's article stated that *In re Will of Ferrill (Thorp v. Cash)*, 97 N.M. 383, 640 P.2d 489 (Ct. App. 1981) made it "virtually impossible for a testator who is old and infirm to dispose of his property in a manner that a judge or jury might interpret as unnatural or unjust." Alcock, *supra* at 401. Given that the *Ferrill* Court *approved* a finding of unnatural or unjust disposition, and given the context within Alcock's article, it seems that she meant to write that it is virtually impossible that a judge or jury might *not* interpret any given disposition as unjust or unnatural after *Ferrill*. As we have explained, the presumption makes it *easier* for a will contestant to get before the jury, although it may not make it any easier for that contestant to win.

already been conveyed to Viola. Because no evidence suggests that the will was intended by either Viola or Gregoria to convey Gregoria's real property, evidence about Gregoria's intentions regarding the real property are irrelevant to our determination of whether the will was an unjust disposition.

**{29}** Without this evidence, precious little remains to show that Gregoria's will was an unjust disposition; Siblings' other testimony stated that the sentiments in the will were false, but did not suggest that Gregoria had any intention to leave other parts of her estate to them. Such evidence alone is certainly not sufficient to support a finding of suspicious circumstances. However, it would be arbitrary to refuse to consider evidence that a will is full of false or unrepresentative assertions about the people it disinherits. *See* 3 William J. Bowe & Douglas H. Parker, *Page on the Law of Wills* § 29.126, at 812 (2004) (explaining that "evidence is admissible to explain the actual relations which existed between testator and the beneficiaries under the will, on the one hand, and the relations between the testator and the natural objects of his bounty, on the other, including the conduct of the beneficiaries and heirs respectively toward testator, and his actual feelings for them, as far as such conduct, feelings, and the like, furnish motives and reasons for or against the will" (footnotes omitted)). Since evidence of Gregoria's relations with her children appears somewhat relevant to the question of undue influence, we see no reason to hold that the district court should not have considered it along with the other evidence.

### c. Participation in the Procurement

**{30}** The district court found that "Viola Varela was directly involved in the procurement of the Will and the deeds to herself." The Court of Appeals held that there was insufficient evidence to support this finding. *Chapman*, 2008-NMCA-108, ¶ 27. Citing *Gonzales*, 108 N.M. at 586, 775 P.2d at 1303, the Court of Appeals held that Siblings had to show that Viola "became the beneficiary of the will by securing its legal execution." *Chapman*, 2008-NMCA-108, ¶ 27. In other words, the proponent's participation had to be "necessary for the legal execution of the will." *Id.* ¶ 29. As a result, the Court refused to consider evidence of Viola's participation in creating earlier versions of the will that never took legal effect, or the extent to which she participated in non-legally required ways in the will's final execution. *Id.* ¶ 27. Because it was undisputed that Viola took no part in the ultimate legal execution of the will and because "no evidence that Viola's actions relating to the execution of the will influenced Gregoria's stated intent[,]" the Court of Appeals found insufficient evidence that Viola participated in procuring the will. *Id.* ¶¶ 29-30. We disagree.

**{31}** First, the Court's definition of participation in the procurement was incorrect. In *Gonzales*, the case relied upon by the Court of Appeals, we simply observed that because the will proponent's signature on the will was not legally required for its execution, "[i]t cannot be said that [the proponent] participated in procuring the will *by securing its execution* when his signature was unnecessary." 108 N.M. at 586, 775 P.2d at 1303 (emphasis added). This holding does not *require* that the contestant have taken a legally required role in the will's execution to have participated in its procurement; instead, it merely states the obvious: if

the proponent's role was not legally required, the contestant cannot argue that the proponent participated in the procurement *by securing its execution*. The proponent still might have participated in the procurement *in other ways*.

**{32}** Other New Mexico case law supports this interpretation. In *Doughty*, 117 N.M. at 290, 871 P.2d at 386, the Court of Appeals found substantial evidence to support the district court's finding of participation in the procurement relating to inter vivos transfers that effectively disinherited the decedent's daughter. The decedent had wanted to make an inter vivos gift of Chevron stock to her children, but she also wanted to receive dividends on the stock throughout her life. *Id*. at 286-87, 871 P.2d at 382-83. However, the decedent's daughter would only accept the gift if income taxes on the dividends would be taken from the dividends. *Id.* Decedent's son communicated this to the decedent, which upset her, but did not inform the daughter that the decedent was upset. *Id.* at 287, 871 P.2d at 383. This precipitated the decedent's inter vivos transfer of other assets to the son. *Id*. at 290, 871 P.2d at 386. The son further enabled the transfer of these assets by visiting the bank, instructing the bank to prepare the required documents, and delivering them to his mother at the hospital. *Id.* The son was not present at the signing, but the Court of Appeals nevertheless concluded that "he initiated, pursued, and completed the entire process." *Id*. Similarly, in *Hummer,* 75 N.M. at 284, 404 P.2d at 117, we found evidence to support the trial court's finding of participation in the procurement where the proponent of the will, though not legally necessary for the execution of the will, *id.*, had taken decedent to the attorney to execute it and had convinced her en route of everything it should contain. *Id*. at 277, 284, 404 P.2d at 112, 117.

**{33}** With these cases in mind, we conclude that the evidence considered by the district court was relevant to the question of undue influence. Evidence was presented that about a year and a half before the will was executed, a separate and nearly identical document had been signed by Gregoria and notarized. Victoria Varela, Viola's daughter, testified that she had typed this earlier will based on Gregoria's dictation, without reference to any notes or drafts. Viola, in her testimony, adopted her daughter's version of events. However, Viola also admitted that before Victoria had typed the earlier will, Viola had purchased a will template at a stationery store and typed it up herself, creating a document nearly identical to the earlier will that Victoria claimed to have written from Gregoria's statements without reference to any notes or drafts. Despite this revelation, Viola persisted in claiming that the template was not used to create the earlier will. Moreover, Viola's and Victoria's testimony contradicted statements made by Viola elsewhere in her testimony and in her deposition that her mother had written out a rough draft which was used to type the earlier will.

**{34}** After the earlier will was drafted, Viola took her mother to have it notarized, but failed to follow the formalities required under the Probate Code. Attorney Ruben Rodriguez testified that a year and a half later, Viola contacted him to have the earlier will "check[ed] and redo[ne,]" apparently specifying that the language in the earlier will should be copied exactly. Viola and Gregoria then came to Rodriguez's office on two different occasions. The first time, both Viola and Gregoria were present, and they explained again that they

15

wanted a more professional will, but that it should contain the same language as the earlier will. Accordingly, the will as it was finally executed is largely identical to the earlier will, with the exception of the addition of a residuary clause to Viola's benefit. The second time they visited Rodriguez, Viola was asked to leave while Rodriguez confirmed that the will reflected Gregoria's intent and then properly executed it.

**{35}** From this evidence, the finder of fact reasonably could have inferred that Viola both wrote the language that ended up in the will and also shepherded it through multiple drafts and meetings with a notary and an attorney until the will had been properly legally executed in nearly the exact form in which Viola had first drafted it. Common sense dictates that this sort of conduct could be considered a *more* suspicious form of participation in the procurement of a will than merely affixing a legally required signature. The district court properly considered this evidence in making its ultimate determination of whether the presumption was raised.

### d. Domination or Control

**{36}** The district court made the following findings relating to domination or control:

> 11. Viola Varela used her position of confidence and power to her advantage to influence and control the actions and decisions of Gregoria C de Baca.

> 12. Viola Varela used her position of influence and control to manipulate the bank accounts of Gregoria C de Baca.

> . . . .

> 17. Viola Varela had an assertive and domineering personality. Gregoria C de Baca was submissive when around Viola.

> 18. Viola Varela attempted to poison the relationship between Gregoria C de Baca and her other children by making disparaging and derogatory remarks about them and attempting to restrict their access to Ms. C de Baca.

> 19. Viola Varela interfered with the efforts of Gregoria C de Baca to obtain independent legal counsel.

**{37}** Using *Hummer* as its touchstone, the Court of Appeals reversed the district court, holding that there was insufficient evidence to demonstrate control and dominance, since "[t]here is no indication that Gregoria was afraid of Viola or that Viola induced Gregoria to believe things that she otherwise would not have believed." *Chapman*, 2008-NMCA-108, ¶ 32. The Court acknowledged the evidence that Viola spoke for Gregoria and disparaged

16

the other siblings, but noted that no evidence had shown that the other siblings' relationships with their mother were interrupted by Viola. *Id.* The Court also noted the testimony of the psychologist who evaluated Gregoria and of Gregoria's doctor, both to the effect that Gregoria had not been dominated by Viola. *Id.* ¶¶ 33-34. As for Viola's alleged interference with Gregoria's attempt to secure legal counsel to return the land deeded to Viola, the Court of Appeals held that "[e]ven if Viola influenced Gregoria's decision to fire [the attorney], we do not believe that evidence supports a further inference that Viola manipulated Gregoria into making a will that did not reflect her intentions." *Id.* ¶ 37. None of this evidence helped to decide "the ultimate issue–whether Gregoria intended the distribution of her property that is set out in the will." *Id.* ¶ 38.

**{38}**    We see no reason to categorically exclude the evidence considered by the district court, even though, under our precedents, it might not be sufficient by itself to decide the issue of undue influence. The Court of Appeals was correct that the decedent in *Hummer* was more dominated by the proponents of her will than is true in this case. 75 N.M. at 284, 404 P.2d at 117 ("There is evidence that decedent was easily influenced, made no independent suggestions herself, agreed with anything anyone stated to her, and that she agreed with what the last person to talk to her had to say."). However, *Hummer* gives no indication that this level of domination is the *baseline* below which evidence of dominance or control may not even be considered. We do not see why less definitive evidence should not be considered. *See*, *e.g*., *Peralta*, 2006-NMCA-033, ¶ 22 (taking into account evidence that "[two of the decedent's children] were maligning [a third child] to [the decedent] in an apparent effort to isolate [the decedent]"). Other authorities also state a less exacting standard: 3 Bowe & Parker, *supra* § 29.78, at 692-93 opines that "[e]vidence which tends to show that the beneficiary acquired control over testator's mind before the will was made, and retained such control beyond the period at which the will was executed, is admissible, even if such evidence relates to a remote period of time" (footnotes omitted).

**{39}**    Moreover, this section of the Court of Appeals' opinion appears to draw some inferences against the party that prevailed at trial. *See Chapman*, 2008-NMCA-108, ¶¶ 33, 37, 40. For instance, the evidence presented by a psychologist, the family doctor, and the attorney who executed the will that Gregoria was not dominated by Viola is evidence *contrary* to the district court's ultimate finding of undue influence. As we have noted, when reviewing for sufficiency of the evidence, "[w]e consider the evidence in the light most favorable to the prevailing party and disregard any inferences and evidence to the contrary." *Doughty,* 117 N.M. at 287, 871 P.2d at 383. The question is whether, disregarding these witnesses as the finder of fact was entitled to do, there was evidence to *support* a finding of control or dominance.

**{40}**    We find support in the record for all of the findings of fact made by the district court on this point:  that Viola may have taken part in firing an attorney retained by Gregoria to investigate the deeds; that Viola spoke for Gregoria; that Viola disparaged the other siblings, although not to the point of estranging them; that Gregoria was submissive around Viola; and that Viola manipulated Gregoria's bank accounts.

17

**{41}** We see no reason to categorically exclude this evidence from consideration, even if it might not be sufficient in and of itself to raise the presumption of undue influence. We find curious, for example, the Court of Appeals' statement that "[e]ven if Viola influenced Gregoria's decision to fire [her attorney], we do not believe that evidence supports a further inference that Viola manipulated Gregoria into making a will that did not reflect her intentions." *Chapman*, 2008-NMCA-108, ¶ 37. The firing in question occurred only a few months after the execution of the will and would certainly seem to suggest that Viola was exerting control over Gregoria, if accepted as true by the finder of fact. Although this evidence does not directly go to the issue of Gregoria's intent regarding the will, it flies in the face of reason to hold that it could not contribute in any way to raising a suspicion of undue influence.

### e. Secrecy

**{42}** The district court found that "Viola Varela was secretive. She did not keep Gregoria C de Baca or her brothers and sisters informed of some actions taken concerning the properties and assets of Gregoria C de Baca." The Court of Appeals again disagreed, holding that there was insufficient evidence to support this finding because other family members had already discovered the deeds after Viola's son angrily boasted of owning all of Gregoria's property. *Chapman*, 2008-NMCA-108, ¶ 44. They were therefore able to confront Gregoria about the property transfer, unlike the contestant in *Doughty*, who only found out about her mother's inter vivos transfers when it was too late to ask her about them. *Id.* For this reason, the Court of Appeals concluded that the evidence of secrecy did not help "this Court determine whether the transfer was not the mother's intention." *Id.* Our analysis differs.

**{43}** It is undisputed that despite ample opportunities, Viola did not tell her siblings or Gregoria's other potential heirs, other than her own children, about the will. This seems to be sufficient evidence of secrecy to us, but because the Court of Appeals addressed the deeds, so will we. Siblings discovered the deeds through Viola's son's inadvertence and did not discover the will until after Gregoria's death. It is true that because of the nature of many undue influence cases, secrecy often prevents the contestant of the will or other conveyance from determining whether the testator or grantor had been unduly influenced by directly asking him or her. *See, e.g., Doughty*, 117 N.M. at 287, 290, 871 P.2d at 383, 386. However, this eventuality seems to be due to cases involving the dead rather than an underlying policy behind the inquiry into secrecy. Simply because Gregoria's children were able to ask her about the deeds does not indicate to us that Viola's secrecy was any less suspicious, especially with regard to the will. Indeed, when Siblings asked Gregoria about the deeds, Gregoria claimed that she *had not executed them.* While this gave Siblings the opportunity to attempt to undo some of Viola's alleged undue influence, their failure to do so during Gregoria's lifetime–possibly due to improper intervention by Viola into their efforts to find an attorney for Gregoria–does not negate the suspicious character of Viola's secrecy. Moreover, if Siblings had succeeded in their first effort to revoke the deeds, they

18

never could have confronted Gregoria with the provisions of the will that are directly in question in this case; Siblings did not discover the will until after Gregoria died. This seems to us to be a perfect example of the sort of conduct a fact finder might properly take into account in deciding whether suspicions were raised that a will proponent was attempting to prevent others from discovering his or her undue influence.

### f.        Lack of Consideration

**{44}**    It does not appear that the district court made any finding relevant to the issue of lack of consideration. However, citing *Gersbach*, the Court of Appeals concluded  that the evidence of Viola's service to Gregoria and the opinions of various witnesses that Gregoria wanted Viola to inherit her estate either helped to rebut the presumption of undue influence or prevented it from arising in the first place. *Chapman*, 2008-NMCA-108, ¶ 45. This is a misreading of our law, but an understandable one given the lack of clarity on this point found in *Gersbach*. On the one hand, *Gersbach* notes that "lack of consideration for a testamentary gift ordinarily is not a suspicious circumstance. Ordinarily, a testator intends to confer a benefit."  1998-NMSC-013, ¶ 20.  On the other hand, *Gersbach* also stated that "the existence of consideration may help *rebut* a presumption of undue influence" or that "a friendship of long standing may help *prevent a presumption of undue influence from arising*." *Id*. ¶ 21 (emphasis added).

**{45}**    *Gersbach* was correct to the extent that it suggested that lack of consideration is not a suspicious circumstance in many cases involving wills. *Montoya*, 113 N.M. at 111, 823 P.2d at 911 (holding that "[a]lone, the lack of consideration may not be a suspicious circumstance," but that in combination with other suspicious circumstances that made a gift unlikely, it might be considered). It was also correct that evidence of consideration certainly might be taken into account by the finder of fact in deciding whether the contestant has met his or her burden of persuasion–although, as discussed above, it is not clear whether this can accurately be described as "rebutting the presumption." However, *Gersbach* also suggested that evidence of friendship or other consideration can prevent a presumption from arising in the first place. Although this statement may contain a grain of truth–for example, the bar for proving that an unjust disposition could be higher when the will proponent is a long-standing friend than when he or she is a stranger–this factor cannot be a free-standing invitation for the appellate court to reweigh the evidence presented by the parties. To take Viola's friendship and service into consideration in deciding whether the presumption arose in this case would amount to a drawing of inferences contrary to the findings of the district court. *Las Cruces Prof'l Fire Fighters v. City of Las Cruces*, 1997-NMCA-044, ¶ 12, 123 N.M. 329, 940 P.2d 177 ("The question is not whether substantial evidence exists to support the opposite result, but rather whether such evidence supports the result reached.").

### g.        Viewed as a Whole, There Was Sufficient Evidence of Suspicious Circumstances

**{46}**    We have found support for the district court's findings of old age or weakened

19

physical or mental condition; participation in the procurement, domination, or control; and secrecy. Although these factors in combination will not necessarily raise a suspicion of undue influence in all cases, and the specific pieces of evidence in this case might not be enough individually to justify a finding of suspicious circumstances, we hold that under the facts of this case, the district court was justified in concluding that suspicious circumstances existed. The finder of fact could reasonably have found that Viola, who had a relationship with Gregoria suggesting some measure of dominance, drafted and secured the execution of a will for Gregoria benefitting herself and disparaging her siblings at a time when Gregoria was suffering from various ailments that could have affected her cognition, and then kept the will secret from Gregoria's other children until after Gregoria's death. Together, this evidence was sufficient to allow the trier of fact to conclude the existence of suspicious circumstances by clear and convincing evidence.

**D.     THERE WAS SUFFICIENT EVIDENCE TO RAISE THE PRESUMPTION AND SUPPORT THE DISTRICT COURT'S FINDING OF UNDUE INFLUENCE**

**{47}**     Because there was sufficient evidence for the finder of fact to conclude that Viola and Gregoria shared a confidential or fiduciary relationship and additionally that suspicious circumstances existed, there was by definition sufficient evidence to raise the presumption of undue influence. Once raised, this presumption "permit[ted] the fact finder to draw an inference of the presumed fact from proof of the basic or predicate fact." *Roberts Oil Co.,* 113 N.M. at 756, 833 P.2d at 233. Therefore, we must conclude that there was sufficient evidence to support the district court's finding of undue influence.

**III.     CONCLUSION**

**{48}**     Because there was sufficient evidence presented at trial to support the district court's finding that Gregoria's will was the product of undue influence, we reverse the Court of Appeals and affirm the district court. We remand the case to the Court of Appeals to determine the question of undue influence regarding Gregoria's deeds to Viola.

**{49}     IT IS SO ORDERED.**

_____

**EDWARD L. CHÁVEZ, Chief Justice**

**WE CONCUR:**

_____

**PATRICIO M. SERNA, Justice**

_____

20

**PETRA JIMENEZ MAES, Justice**

_____

**CHARLES W. DANIELS, Justice**

_____

**KAREN L. PARSONS (sitting by designation)**

**Topic Index for _Chapman v. Varela_, No. 31,234**

| | |
|---|---|
| **AE** | **APPEAL AND ERROR** |
| | |
| AE-AR | Appellate Review |
| AE-SB | Substantial or Sufficient Evidence |
| | |
| **CP** | **CIVIL PROCEDURE** |
| | |
| CP-BP | Burdens of Proof |
| CP-FD | Findings and Conclusions |
| CP-PF | Prima Facie Case |
| | |
| **EV** | **EVIDENCE** |
| | |
| EV-PS | Presumptions |
| EV-PF | Prima Facie Case |
| EV-RC | Relevancy, Materiality, and Competency |
| EV-SS | Substantial or Sufficient Evidence |
| | |
| **WL** | **WILLS, TRUSTS AND PROBATE** |
| | |
| WL-UI | Undue Influence |